# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Janda v. United States Cellular Corp.*, 2011 IL App (1st) 103552

| | |
|---|---|
| Appellate Court Caption | LAWRENCE P. JANDA, Plaintiff-Appellant, v. UNITED STATES CELLULAR CORPORATION, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-10-3552 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Filed | September 30, 1011<br><br>November 1, 2011<br>November 18, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action alleging breach of contract and a claim for promissory estoppel arising from the termination of plaintiff's employment, the grant of defendant's motion for summary judgment as to the breach of contract was affirmed and the dismissal of the promissory estoppel claim was reversed, where plaintiff was an at-will employee, despite defendant's adoption of a policy, that included a mandatory progressive discipline procedure, and where plaintiff's promissory estoppel claim was not precluded by the employment agreement or the employment handbook acknowledgments. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-L-012101; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |

Counsel on
Appeal

Todd C. Lyster, of Todd C. Lyster & Associates, of Chicago, for appellant.

Kenneth L. Schmetterer, of DLA Piper LLP (US), of Chicago, for appellee.

Panel

PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion.

Justice Lampkin concurred in the judgment and opinion.

Justice Garcia concurred in part and dissented in part, with opinion.

# OPINION

¶ 1    This appeal concerns the termination of plaintiff Lawrence Janda from his employment with defendant United States Cellular Corporation (USCC). Plaintiff was an employee for USCC from 1996 until his termination in 2005. Plaintiff filed suit against USCC, alleging breach of contract and a claim for promissory estoppel. Plaintiff alleged that he was terminated based on statements made during a meeting that he was told would be confidential and that his termination violated USCC's "Dynamic Organization" policy, which included a mandatory progressive discipline procedure. USCC filed a motion for summary judgment on count I of the complaint and a motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2008)) on count II. USCC claimed that plaintiff's breach of contract claim was precluded by plaintiff's written employment agreement, which provided that employment was at will, and by the fact that associate handbooks contained disclaimers that they provided no contractual rights. USCC further claimed that the claim for promissory estoppel was precluded by the existence of the employment agreement. In response, plaintiff filed a motion for discovery pursuant to Illinois Supreme Court Rule 191(b) (eff. July 1, 2002). The trial court granted both of USCC's motions and denied plaintiff's motion for discovery in part. Plaintiff appeals, arguing that the trial court erred in: (1) granting summary judgment in USCC's favor because the written contract was modified by USCC's Dynamic Organization policy and its progressive discipline procedure, (2) dismissing count II of the complaint because the promissory estoppel claim is independent of the breach of contract claim, and (3) denying plaintiff's motion for discovery. We affirm in part and reverse in part.

¶ 2                          BACKGROUND
¶ 3                       I. Procedural History
¶ 4    On October 25, 2007, plaintiff filed a complaint against USCC for breach of contract.

The complaint alleges that in July 1996, plaintiff was hired by USCC as a fixed-asset administrator and was subsequently promoted to the position of manager of financial systems and developments. The complaint further alleges that plaintiff was a good employee and was never given any indication that his performance was lacking or needed improvement.

¶ 5       The complaint alleges that on November 3, 2005, plaintiff was terminated from his employment "as a direct result of the acts of George Irving," who also worked at USCC, and that Irving was the cause of the termination of several other USCC managers.

¶ 6       The complaint alleges that at the time of his employment, plaintiff and USCC entered into an oral employment agreement. Plaintiff later received a handbook from USCC, which plaintiff alleges became part of the employment agreement, as was the company's "Dynamic Organization Progressive Disciplinary Process." The handbook contained a list of behaviors that were cause for immediate dismissal and other behaviors that were cause for remedial action, and "it was company policy that no employee was to be terminated for 'just cause' unless all specified verbal and written notices were given to the employee, and documented in their personnel file." The complaint alleges that plaintiff's termination violated the company policy set forth in the handbook and the oral employment promises made by USCC to plaintiff. Plaintiff sought damages in excess of $57,000.

¶7       On September 9, 2009, USCC filed a motion for summary judgment. The motion claimed that plaintiff's claim was precluded by a written employment agreement and that, even absent the written agreement, the complaint failed to set forth any clear, definite terms of any alleged oral agreement sufficient to overcome the presumption of an at-will employment. The motion further claimed that the progressive discipline policy was not a contract, nor were the policy handbooks, which included disclaimers that they were not contracts. The motion also claimed that even if the progressive discipline policy was a contract, it was not breached, and that plaintiff's claim was barred by the statute of frauds.

¶ 8       On September 11, 2009, plaintiff made an oral motion to file an amended complaint, which was granted by the trial court. On September 28, 2009, plaintiff filed a verified amended complaint. The complaint contained substantially the same factual allegations as the original complaint, and count I of the amended complaint was the identical breach of contract claim other than an additional allegation claiming that USCC's Dynamic Organization policy modified the oral contract.

¶ 9       Count II of the amended complaint was a claim for promissory estoppel. Count II alleges that plaintiff participated in a focus group meeting on June 15, 2005, concerning the performance of various members of management, including George Irving. The complaint alleges that the participants were told that everything said by them would be completely confidential and that they had no fear of retaliation for anything they said during the meeting. John Rooney, president and chief executive officer of USCC, also specifically stated that the contents of the focus group meeting were confidential. In reliance on those representations, the participants, including plaintiff, spoke candidly.

¶ 10       The complaint alleges that after the meeting, Irving met with plaintiff and others present at the meeting and asked each of them what had been said during the meeting and by whom. Irving told them that "he had heard that there were some nasty comments made about him

during the meeting." The complaint further alleges that Irving was told the contents of the meeting by one of the participants. The complaint alleges that each of the leaders present at the meeting, with the exception of the individual who informed Irving of the content of the meeting, was terminated, transferred, or left the company.

¶ 11 The complaint alleges that after plaintiff was terminated, Irving informed USCC employees that plaintiff was terminated based on a performance improvement plan and that he had been terminated for " 'poor performance reasons.' " Both of these statements were false.

¶ 12 On October 23, 2009, USCC filed a motion for summary judgment[1] on count I of the amended complaint and a motion to dismiss count II pursuant to section 2-619 of the Code. The motion for summary judgment was identical to the motion previously filed. USCC claimed that count II should be dismissed because a claim for promissory estoppel was precluded where an employment contract exists and disclaimers were provided with the policy handbook on which the employee purported to rely.

¶ 13 On November 16, 2009, plaintiff filed a Rule 191(b) motion for discovery in response to USCC's motion for summary judgment and to dismiss. The motion claimed that the Dynamic Organization procedures altered plaintiff's agreement with USCC. Plaintiff further claimed that his affidavit, complaint, and deposition testimony were sufficient to withstand the motion to dismiss. Plaintiff claimed that he had requested to depose John Rooney, president and chief executive officer of USCC, but USCC refused to produce him. Plaintiff argued that Rooney was the "key witness" in the litigation and that his testimony was required in order to demonstrate that the Dynamic Organization and the mandatory progressive discipline procedures modified the employment agreement. Plaintiff further claimed that the deposition of Tracey Banks-Giles was required because she filed an affidavit concerning exhibits to USCC's motion and "[h]er deposition must be taken to determine the circumstances regarding each of those pages, to understand what they actually mean and why said documents were generated and/or modified."

¶ 14 Plaintiff further argued that Fran Trojan and Lynn Wendt, two other leaders who had also been terminated by USCC, had also filed suit against USCC and that their deposition testimony supported plaintiff's contention that the Dynamic Organization modified the employment agreement. Thus, plaintiff argued that Rooney's deposition was necessary and that there were genuine issues of material fact concerning his employment relationship.

¶ 15 On April 30, 2010, USCC filed an amended motion for summary judgment on count I of the complaint and a section 2-619 motion to dismiss count II of the complaint.[2] USCC

[1] USCC's motion was actually an amended motion for summary judgment and section 2-619 motion to dismiss, because on October 6, 2009, USCC had mistakenly refiled the earlier motion for summary judgment, which addressed plaintiff's initial complaint, instead of its motion addressing the amended complaint.

[2] This motion was technically the second amended motion, after the motions filed October 6, 2009, and October 23, 2009.

noted that after it had filed its motion for summary judgment and to dismiss in October 2009, plaintiff's counsel took the deposition of Rooney in Wendt's related case[3] and was permitted to ask additional questions that pertained to plaintiff in the instant case. The motion further noted that the court sought amended briefing on USCC's motion, resulting in the filing of the amended motion. The only additional claim in the motion was that plaintiff's claim that he was entitled to notice prior to termination was refuted by the undisputed evidence, including plaintiff's admissions and the unrefuted testimony of Rooney.

¶ 16        On October 27, 2010, the trial court entered an order in which it granted USCC's motion for summary judgment and its motion to dismiss. The trial court also granted plaintiff's request that his discovery motion be considered his response to the motion for summary judgment and to dismiss. The court ordered the deposition of John Rooney to be incorporated into the instant case and denied plaintiff's motion for discovery as to all other individuals.

¶ 17                                        II. Exhibits

¶ 18        The parties attached a number of documents to their various motions, including affidavits, depositions, and deposition exhibits.

¶ 19                                      *A. Affidavits*

¶ 20                          1. Affidavit of Tracey Banks-Giles

¶ 21        USCC attached the affidavit of Tracey Banks-Giles to its motion for summary judgment filed on September 9, 2009. Banks-Giles' affidavit stated that she was director of associate relations for USCC, a position that made her familiar with the employment records of USCC associates. The affidavit further stated that several documents attached as exhibits from plaintiff's deposition were true and accurate copies that were prepared and maintained by USCC in the regular course of business. The documents were: (1) an application of employment signed by plaintiff on June 11, 1996, (2) an employment agreement executed by plaintiff and USCC on July 22, 1996, (3) two "Receipt[s] of Associate Handbook" signed by plaintiff, one on July 22, 1996, and one on January 25, 2000, and (4) an "Acknowledgment" signed by plaintiff on May 20, 2002. Finally, the affidavit stated that USCC had no record of any written modifications of the employment agreement

¶ 22                              2. Affidavit of Plaintiff

¶ 23        Plaintiff attached his affidavit to his motion for discovery. In the affidavit, plaintiff stated that the Dynamic Organization was incorporated into the employment agreement he had with USCC. He further stated that "[a]ll management personnel were told that the policies contained in and related to Dynamic Organization, including the Progressive Discipline policy were *not* guidelines, and that deviations from said tenets would not be tolerated." (Emphasis in original.) Plaintiff stated that although the Dynamic Organization was not listed in the associate handbook, the annual performance evaluation contained an entire section

---

[3]Plaintiff's counsel is also representing Wendt in that case.

-5-

devoted to the Dynamic Organization; even if an employee performed satisfactorily in all other respects, he or she could be terminated solely for failing to follow the tenets of the Dynamic Organization.

¶ 24                    3. Affidavits of Fran Trojan and Lynn Wendt

¶ 25    Plaintiff's discovery motion also included affidavits from Wendt and Trojan, which were identical to the affidavit filed by plaintiff.

¶ 26                    *B. Deposition Testimony*

¶ 27                    1. Plaintiff's Deposition

¶ 28    USCC's motion for summary judgment, filed on September 9, 2009, contained transcripts from plaintiff's deposition. Plaintiff testified that he and USCC entered into an oral employment agreement in July 1996 for plaintiff to work at USCC for approximately $13 per hour; plaintiff testified that the oral agreement came into existence through a conversation he had with the person who hired him. Plaintiff testified that he was promoted several times, eventually becoming manager of financial systems and development, a position in which he was a "leader."[4] At the time of his termination, plaintiff was supervising seven employees. When he began his position as manager of financial systems and development, plaintiff participated in management training.

¶ 29    Plaintiff testified about a company policy called the "Dynamic Organization," which was implemented in 2000. Plaintiff testified that the Dynamic Organization "changed a lot of things" and "kind of reset our expectations in what we were expected to do and our agreement with the company." Plaintiff testified that as a leader, he received extra training specifically concerning the progressive discipline policy, which was "integrated with" the Dynamic Organization. However, plaintiff testified that even before the establishment of the Dynamic Organization, USCC was required to use progressive discipline prior to terminating him. Plaintiff explained that under the progressive discipline policy, there were certain "egregious" acts that would result in immediate termination, but that generally, several "write-ups" and opportunities to improve were required prior to termination. He testified that the progressive discipline procedure was written in company policies.

¶ 30    After the Dynamic Organization was implemented in 2000, plaintiff testified that John Rooney "basically told us we are either on the bus or we are not." Plaintiff further testified that USCC again entered into an oral employment agreement with him when the Dynamic Organization was implemented and Rooney told the USCC employees to "either accept this or not *** I think that definitely was an agreement between Jack and the rest of the organization." Plaintiff testified that the progressive discipline procedure was part of the Dynamic Organization and that the progressive discipline policy altered the agreement he had with USCC. Plaintiff testified that the Dynamic Organization had a number of components

---

[4]According to plaintiff's deposition testimony, USCC referred to employees as "associates" and referred to employees who managed other employees as "leaders."

and that he participated in classes and a "boot camp" about the Dynamic Organization. During these classes, plaintiff testified that the participants discussed the progressive discipline procedure and engaged in "mock interviews" in which they dealt with hypothetical performance issues. Plaintiff testified that Rooney also discussed the Dynamic Organization at a number of meetings and through communications such as memos and e-mails.

¶ 31 Plaintiff testified that nobody ever personally mentioned to him whether he was an at-will employee and "[t]hat term never came up to [him]." He testified that Landa Leichtling, his supervisor, reviewed the progressive discipline policy with him, but testified that "[i]t was more on the focus on how would I discipline my employees and what was expected of me as a leader." Plaintiff testified that the progressive discipline policy was mandatory and that he had been told so in several management courses. He had also been taught that the company reserved the right to impose accelerated discipline and that USCC had the right to change its policies. Plaintiff testified that he learned that there were some issues that could prompt immediate termination without following the steps of progressive discipline.

¶ 32 Plaintiff testified that it was his understanding that even a leader who was not performing adequately would be entitled to progressive discipline. Plaintiff also testified that he did not have a written document saying he was no longer an at-will employee or that he could not be terminated unless he was provided with progressive discipline.

¶ 33 Plaintiff also testified about the rankings available on job performance evaluations. He testified that approximately three quarters of leaders received a ranking of "meets expectations" or lower, and that it was "tough" to receive a ranking of "exceeds expectations." He testified that he always strove to receive a ranking of "exceeds expectations." Plaintiff testified about an annual review of his work that was performed on February 24, 2005. He testified that the review stated that he needed to improve his communication style "to be less negative in [his] tone and body language" and that he needed to improve his expertise in an accounting system Leichtling wanted him to learn. He further testified that he needed to learn to communicate better and to delegate more. He also needed to be more direct in coaching his associates and in communications with his leaders, including George Irving, a vice president of business support services at USCC.

¶ 34 Plaintiff also testified about culture surveys completed by USCC employees. He testified that the surveys were a way to evaluate the effectiveness of USCC employees in a variety of categories. He testified that the leaders received scores based on the results of the surveys and that they were also a tool to evaluate where improvement was needed. He testified that the culture surveys were introduced by Rooney when he implemented the Dynamic Organization. Plaintiff further testified that on occasion, there were focus groups in which several leaders would gather to answer questions about Irving's performance and the performance of the department generally.

¶ 35 In the fall of 2005, Irving presented the results of the culture survey at a meeting. He expressed disappointment in the culture survey scores. Plaintiff testified that the department had low scores overall and Irving personally had low scores. Irving imposed a rule at the meeting that everyone needed to have a score above a 3.2 out of a 4-point scale. Plaintiff testified that he had one of the highest scores, but spoke up at the meeting, expressing his

concern over focusing exclusively on numbers, because "sometimes, there were other issues going on with a low score." Plaintiff also testified that some of the other terminated leaders made similar comments during the meeting.

¶ 36    Plaintiff testified that he was terminated from USCC on November 3, 2005. Plaintiff explained that his complaint stated that he was terminated as a direct result of Irving's acts because Irving terminated "a bunch of" leaders on the same day, including plaintiff. Plaintiff testified that the day he was terminated was referred to as "Black Thursday." He testified that most of the people terminated on Black Thursday were not on performance improvement plans; he specifically knew that he was not, nor were Trojan or Wendt. Plaintiff testified that he believed that he was terminated by Irving in retaliation for the comments he made during the focus group meeting.

¶ 37                    2. Wendt's Deposition

¶ 38    Plaintiff's discovery motion included excerpts from Wendt's deposition. At her deposition, Wendt testified about the focus group meeting prior to the release of the cultural survey results in June 2005. She testified that the purpose of the meeting was that "we were supposed to be able to talk candidly, openly, about the company, how we felt about the leadership, how we felt about the Dynamic Organization, about our executive leaders, about our current leaders, and such." She testified that the leader of the meeting emphasized that the information gleaned would be confidential, even stating that he did not wish to learn the participants' names. Wendt testified that she relied on his representations.

¶ 39    Wendt testified that there were eight participants at the meeting. She testified that they discussed Irving, who had joined the department a year prior, and that he was intimidating and that several leaders were afraid of him. She testified that the meeting was "all about" Irving and that he "was a very abrasive leader, and he was absolutely not following any of the guidelines or training that we were given throughout the year." Wendt testified that she was terminated at the same time as plaintiff, Trojan, and another leader, all of whom were participants at the meeting. She further testified that two of the participants transferred to different departments, while two remained within the same department.

¶ 40    Wendt testified that the progressive discipline procedure was part of the Dynamic Organization and that she was required to follow it when disciplining an associate. She testified that she had never been placed on a performance improvement plan and had received no warnings prior to being terminated.

¶ 41                    3. Trojan's Deposition

¶ 42    Plaintiff's discovery motion also included excerpts from Trojan's deposition. In Trojan's deposition, she testified that it was her "distinct understanding" that her at-will employment relationship was altered "[w]ith the introduction of the dynamic organization and the policies and the tenets of that dynamic organization as introduced by Jack Rooney." Specifically, Trojan testified that the "mandatory progressive disciplinary procedure" altered the employment agreement. She further testified that the removal of the term "at will" from the acknowledgment of receipt of the associate handbook "is entirely due to the fact that the

dynamic organization had been firmly entrenched at U.S. Cellular and that disciplinary measures–the progressive disciplinary procedure superseded any at will status."

¶ 43    Trojan also testified about the focus group meeting and the cultural surveys. She testified that the cultural surveys were "absolutely and completely confidential," as was the information revealed in the focus group meeting. She testified that she was terminated on November 3, 2005, and that she had not received any warnings or been placed on a performance improvement plan.

¶ 44                        4. Rooney's Deposition

¶ 45    Attached to USCC's amended motion for summary judgment and to dismiss, filed on April 30, 2010, were excerpts from Rooney's deposition. Rooney testified that he introduced the Dynamic Organization to USCC. Rooney testified that there was nothing in the Dynamic Organization that discussed progressive discipline. He testified that when an employee had a "correctable flaw," the employee's supervisor would implement an improvement plan, but that there was no mandatory progressive discipline process. Rooney testified that there were circumstances in which progressive discipline was not appropriate and that it was not mandatory but was an "option" if the situation called for it.

¶ 46    Rooney testified that he never told plaintiff that he was no longer an at-will employee or that he could not be terminated without going through the progressive discipline process. Rooney also testified that leaders were held to a higher standard and that there were "no training wheels for leaders."

¶ 47    Rooney testified that there were no operating procedures behind the Dynamic Organization, other than the few pages that set forth the principles, behaviors, and values of the Dynamic Organization.

¶ 48                        *C. Deposition Exhibits*

¶ 49    The record also includes the exhibits to plaintiff's deposition.[5] The employment application indicated that plaintiff submitted it to USCC on June 11, 1996. The application contained the following provision:

> "I understand that employment at this Company is 'at will,' which means that either I or the Company can terminate the employment relationship at any time, with or without prior notice, and for any reason not prohibited by statute. All employment is continued on that basis. I understand that no supervisor, manager or executive for the Company, other than the president, has any authority to alter the foregoing."

¶ 50    The employment agreement was executed by plaintiff and USCC on July 22, 1996, and provided, in part:

> "Notwithstanding anything to the contrary, either party may terminate the

---

[5]The exhibits appear to have been included as part of USCC's initial motion for summary judgment filed on September 9, 2009, but many of them are not identified in plaintiff's table of contents to the record and are included out of order in the record.

employment relationship without prior notice to the other. Such termination may be for any reason or no reason at all. The right of either party to terminate the employment relationship is not restricted by this Agreement. ***

* * *

This Agreement contains the entire understanding of the parties and supersedes all prior written or oral agreements or understandings. This Agreement is the valid and binding obligation of Employee and Company and may be amended or modified only by written agreement signed by Employee and an officer of Company."

¶ 51 On the same day, plaintiff also signed an acknowledgment that he had received a copy of the associate handbook. The receipt stated:

"I understand that the associate handbook is not a contract and that the contents of the associate handbook can be changed by USCC without notice at any time. *** I ALSO UNDERSTAND THAT NEITHER USCC NOR I AM COMMITTED TO AN EMPLOYMENT RELATIONSHIP FOR A PERIOD OF TIME AND THAT EITHER PARTY MAY TERMINATE THE RELATIONSHIP AT ANY TIME." (Emphasis in original.)

¶ 52 On January 25, 2000, plaintiff received another copy of an associate handbook and signed an acknowledgment of receipt stating:

"I understand that the associate handbook contains a general explanation of the current policies, benefits and procedures, and is for my information and guidance. It is not, however, a contract or guarantee of employment, either express or implied. Each associate's employment is considered at-will and may be terminated at any time and for any reason. No oral or written representations to the contrary may create an enforceable contract of employment, express or implied.

The Company reserves the right to amend, add to, or revoke any or all of these policies, procedures or benefits, at any time at its sole discretion and without prior notice. ***

I have read and understand the contents of the handbook. I ALSO UNDERSTAND THAT NEITHER U.S. CELLULAR NOR I AM COMMITTED TO AN EMPLOYMENT RELATIONSHIP FOR ANY PERIOD OF TIME, AND THAT EITHER PARTY MAY TERMINATE THE RELATIONSHIP AT ANY TIME." (Emphasis in original.)

¶ 53 The "Acknowledgment" signed by plaintiff on May 20, 2002, stated that it was an acknowledgment of receiving the associate handbook, which also contained USCC's code of business conduct, and provided in part:

"I understand that the Associate Handbook contains a general explanation of the current policies, benefits and procedures, and is for my information and guidance. I also understand that I am expected to follow the policies and procedures outlined in this handbook.

This handbook replaces any prior handbook, policy or procedure. The company reserves the right to amend, add to, or revoke any or all of these policies, procedures or

benefits, at any time at its sole discretion and without prior notice. \*\*\*

I understand that neither U.S. Cellular nor I am committed to an employment relationship for any period of time, and that either party may terminate the relationship at any time for any reason. I also understand the provisions of this handbook do not establish contractual rights between U.S. Cellular and its associates. This handbook is not a contract."

¶ 54 In addition to the signed application for employment, employment agreement, and acknowledgments noted above, the exhibits contain a document from the Human Resources policies and procedures entitled "Progressive Discipline," which was created on April 1, 2000, and revised on March 1, 2003. This document notes that associates should have "ample prior notice" that their behavior may lead to disciplinary action and should be given a "reasonable number of opportunities" to correct the problems. Thus, the steps outlined in the document "are generally followed." The document also provides for "Accelerated Discipline," noting that the outlined steps "give a guideline for workings through the Progressive Discipline process, [but] each step can be used without prior warnings being issued." The document also specifically addresses USCC's leadership: "U.S. Cellular expects its leaders to uphold all core values, beliefs and perform at a level reflective of the Dynamic Organization standards. As such, failure to adhere to these standards could be cause for accelerated disciplinary action up to an[d] including termination." The outlined steps included one verbal warning, two written warnings, and termination. The document also provided for "Immediate Discipline" in situations when immediate disciplinary action, "including termination," may be warranted on the first occurrence of the problem. The document provided a list of examples of such situations, while noting that the list was not all-inclusive; one of the examples was "[f]ailure to fulfill expectations/responsibilities as a leader."

¶ 55                                                ANALYSIS

¶ 56 On appeal, plaintiff makes three arguments: (1) the trial court erred in granting summary judgment in USCC's favor because the written contract was modified by the Dynamic Organization and its progressive discipline procedure, (2) the trial court erred in dismissing count II of the complaint because the promissory estoppel claim was independent of the breach of contract claim, and (3) the trial court erred in denying plaintiff's motion for discovery.

¶ 57                                        I. Summary Judgment

¶ 58 Plaintiff first claims that the trial court erred in granting USCC's motion for summary judgment. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co*., 213 Ill. 2d 307, 315 (2004). We review a trial court's

decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Kahn v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 59        "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

¶ 60        " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 61        In the case at bar, plaintiff claims that there were issues of material fact that should have precluded the trial court's grant of summary judgment in USCC's favor. Plaintiff argues the original at-will employment contract was modified and there was no just cause for plaintiff's termination. Specifically, plaintiff argues that the employment agreement was modified both by the handbook acknowledgment receipts dated May 20, 2002, and by the implementation of the Dynamic Organization and progressive discipline policy.

¶ 62        " 'A valid modification must satisfy all criteria essential for a valid contract, including offer, acceptance, and consideration.' [Citations.]" *Ross v. May Co.*, 377 Ill. App. 3d 387, 391 (2007). Generally, when evidence is introduced to show a modification of a written contract or a waiver of a provision of the contract, the determination of the final agreement between the parties is a question of fact to be determined by the fact finder. *E.A. Cox Co. v. Road Savers International Corp.*, 271 Ill. App. 3d 144, 152 (1995) (citing *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 619 (1988)). "However, if after consideration of the extrinsic evidence, the court determines that reasonable men could reach only one conclusion, the issue can be decided by the court as a matter of law." *E.A. Cox*, 271 Ill. App. 3d at 152 (citing *Wald*, 175 Ill. App. 3d at 619).

¶ 63        The employment agreement signed by plaintiff in 1996 indicated that the employment was at will. Generally, in an at-will employment relationship, either party may terminate the employment at any time without liability for breach of contract. *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 368 (2006) (citing *Martin v. Federal Life Insurance Co.*, 109 Ill.

App. 3d 596, 600 (1982)). Thus, "an employer may terminate an at-will employee at any time for good cause, bad cause or no cause at all." *Emery v. Northeast Illinois Regional Commuter R.R. Corp.*, 377 Ill. App. 3d 1013, 1028 (2007); *Robinson*, 367 Ill. App. 3d at 368. An employment contract is presumed to be at will unless the presumption is overcome by a showing that the parties agreed otherwise. *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 485 (1997). Accordingly, for USCC to have breached its employment agreement by terminating plaintiff, plaintiff must show that his employment was no longer at will.

¶ 64                              *A. Handbook Acknowledgment Receipt*

¶ 65    Plaintiff first claims that there was a written modification of the employment agreement through the execution of the handbook acknowledgment receipt. Plaintiff argues that the employment agreement was modified when the words "at-will" were removed from the handbook receipt signed on May 20, 2002. He argues that the term was deleted "as a direct result of John Rooney's implementation of the Dynamic Organization and Mandatory Progressive Discipline Procedures" and that when plaintiff signed the acknowledgment of receipt on May 20, 2002, he "signed a new agreement, based on John Rooney's Dynamic Organization, that excluded the term 'at-will' and modified the employment agreement." We do not find this argument persuasive.

¶ 66    First, there is no basis for finding that the removal of the words "at-will" from the handbook receipt had any effect on the employment agreement. The employment agreement specifically provides that it "may be amended or modified only by written agreement signed by Employee and an officer of Company." There has been no claim that by signing the handbook receipts, plaintiff was engaging in a written modification of the employment agreement. Indeed, in his deposition testimony, plaintiff acknowledges that there was no written modification to the employment agreement. Additionally, while the term "at-will" has been removed from the May 20, 2002, receipt, the remaining language continues to suggest an at-will employment relationship: "I understand that neither U.S. Cellular nor I am committed to an employment relationship for any period of time, and that either party may terminate the relationship at any time for any reason." Thus, we cannot find a written modification to the employment agreement.

¶ 67                              *B. Dynamic Organization Policy*

¶ 68    Next, plaintiff argues that the employment agreement was modified by the implementation of the Dynamic Organization policy,[6] which included the progressive discipline procedure. He argues that when John Rooney implemented the Dynamic Organization policy, he incorporated the progressive discipline policy as part of the Dynamic Organization policy and modified plaintiff's employment agreement. We do not find this

---

[6]The parties do not discuss whether the Dynamic Organization is a "policy," which has been defined as "a high-level overall plan embracing the general goals and acceptable procedures." Merriam-Webster's Collegiate Dictionary 901 (10th ed. 1998). Since the parties do not dispute the issue, we will treat the Dynamic Organization as a policy.

argument persuasive.

¶ 69 Initially, as noted, the employment agreement provides that amendments or modifications to the agreement may be done "only by written agreement signed by Employee and an officer of Company." Here, there is no claim that there was such an agreement. Plaintiff claims that Rooney waived the requirement that modifications be in writing "by eliminating the term 'at-will' from the Acknowledgment forms after he became President and CEO of USCC. As the top [executive] officer at U.S. Cellular, Rooney also waived any requirements regarding contract modifications through his conduct, including meetings, trainings, [*sic*] and emails." Plaintiff does not provide any authority for the argument that this conduct operates as a waiver of the writing requirement. Nevertheless, even if there was no writing requirement, plaintiff's argument fails.

¶ 70 First, plaintiff does not provide support for his contention that the progressive discipline policy was incorporated into the Dynamic Organization policy and was thereby made mandatory. Plaintiff makes a number of statements throughout his brief concluding that the progressive discipline policy was "clearly incorporated" into the Dynamic Organization policy and "made mandatory" for USCC employees. Indeed, plaintiff goes so far as to state: "Plaintiff alleges that the policy was made mandatory when it was incorporated into John Rooney's Dynamic Organization. The language giving options, such as 'generally', 'guideline' and 'may', was not adopted because John Rooney dictated that it would be a Mandatory Progressive Disciplinary Procedure." However, plaintiff's sole support for these statements is the opinions of plaintiff, Trojan, and Wendt, all of whom are plaintiffs in lawsuits against USCC, and their statements that they believed that the Dynamic Organization policy incorporated the progressive discipline policy and made it mandatory. From our examination of the record, it appears that the human resources document outlining the progressive discipline procedure makes reference to the Dynamic Organization policy, which could support plaintiff's contention that the Dynamic Organization policy incorporated the existing progressive discipline procedure. Given that document, and since we are required to view the facts in the light most favorable to the nonmoving party on a motion for summary judgment (see *Home Insurance*, 213 Ill. 2d at 315), we will accept plaintiff's contention that the Dynamic Organization policy incorporated the progressive discipline procedure. However, there is no such support in the record for plaintiff's claim that the fact that the progressive discipline procedure was incorporated and made part of the Dynamic Organization policy made it mandatory or that Rooney "dictated" that the progressive discipline procedure would be mandatory. To withstand summary judgment, plaintiff must present some factual basis that would support his claim. See *Schrager*, 328 Ill. App. 3d at 708 (citing *Luu*, 323 Ill. App. 3d at 952). Accordingly, we do not accept plaintiff's claim that the language of the progressive discipline procedure was altered and made mandatory upon incorporation or through some edict of Rooney's. However, we will consider, and will discuss below, the beliefs of plaintiff, Trojan, and Wendt that the progressive discipline procedure was mandatory.

¶ 71 The fact that the progressive discipline procedure was incorporated into the Dynamic Organization policy does not automatically result in a victory for plaintiff. In order for plaintiff to prevail, we must find that the Dynamic Organization policy, and specifically the

-14-

progressive discipline procedure, modified plaintiff's existing employment agreement. The Illinois Supreme Court has held that an employee handbook or policy statement can, in some cases, create enforceable contractual rights. See *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987). There are three requirements for a policy statement to be considered a contract:

> "First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement." *Duldulao*, 115 Ill. 2d at 490.

If these requirements are satisfied, "the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed." *Duldulao*, 115 Ill. 2d at 490. In the case at bar, we find that the Dynamic Organization and progressive discipline policy fails to meet the first *Duldulao* requirement as a matter of law.

¶ 72    In order for a policy statement to confer contractual rights, it must first "contain a promise clear enough that an employee would reasonably believe that an offer has been made." *Duldulao*, 115 Ill. 2d at 490. The question of whether the first *Duldulao* requirement is satisfied is a question of law. *Doyle v. Holy Cross Hospital*, 289 Ill. App. 3d 75, 78 (1997). In the case at bar, plaintiff points to his deposition, as well as the deposition testimony of Wendt, and Trojan, to support his argument that USCC employees reasonably believed that the Dynamic Organization and the progressive discipline policy "w[as] part of a modified contract." However, the language of the progressive discipline policy itself is not sufficiently clear to permit it to be considered a contract.

¶ 73    The progressive discipline policy states that associates should have "ample prior notice" that their behavior may lead to disciplinary action and should be given a "reasonable number of opportunities" to correct the problems; it concludes that the steps outlined in the document "are generally followed." The policy also provides for "Accelerated Discipline," noting that the outlined steps "give a guideline for workings through the Progressive Discipline process, [but] each step can be used without prior warnings being issued." The document also specifically addresses USCC's leadership: "U.S. Cellular expects its leaders to uphold all core values, beliefs and perform at a level reflective of the Dynamic Organization standards. As such, failure to adhere to these standards could be cause for accelerated disciplinary action up to an[d] including termination." The document also provided for "Immediate Discipline" in situations when immediate disciplinary action, "including termination," may be warranted on the first occurrence of the problem. The document provided a list of examples of such situations, while noting that the list was not all-inclusive; one of the examples was "[f]ailure to fulfill expectations/responsibilities as a leader." We find that the language of this policy is not sufficiently clear to satisfy the first *Duldulao* requirement as a matter of law.

¶ 74    The dispositive language in the progressive discipline policy is the reference to

"generally" following the steps of the policy, the fact that the steps provide a "guideline" to be followed, the fact that each step can be used without prior warnings being issued, and the provision for immediate termination on the first occurrence of a problem. Language such as the terminology included in the policy at bar has previously been held not to satisfy the first *Duldulao* factor. See, *e.g.*, *Frank v. South Suburban Hospital Foundation*, 256 Ill. App. 3d 360, 369 (1993); *Semerau v. Village of Schiller Park*, 210 Ill. App. 3d 493, 497-98 (1991); *Rudd v. Danville Metal Stamping Co.*, 193 Ill. App. 3d 1009, 1012 (1990).

¶ 75    For instance, in *Frank*, 256 Ill. App. 3d at 370, the appellate court affirmed the trial court's grant of summary judgment in the hospital's favor based on the first *Duldulao* requirement. The employee handbook in that case contained a section concerning discipline that provided that there were "five '[t]ypes of disciplinary action that may be taken,' " progressing from a reprimand to termination; the handbook specified that " '[t]he type of action will depend upon the severity of the offense and the corrective action deemed necessary by the direct supervisor.' " *Frank*, 256 Ill. App. 3d at 362. The hospital's progressive discipline policy also contained the same five examples of disciplinary action and statement that any of the types of disciplinary action could be imposed based on the severity and the circumstances of the offense. *Frank*, 256 Ill. App. 3d at 362. The progressive discipline policy further noted that " '[p]rogressive discipline may begin or advance to any step omitting action at lesser step(s) dependent upon the severity of the employee infraction(s),' " and an employee could be discharged "for 'commission of a first infraction of a serious nature.' " *Frank*, 256 Ill. App. 3d at 362. Finally, the hospital's employee behavior policy listed a nonexhaustive list of behavior that required disciplinary action. *Frank*, 256 Ill. App. 3d at 362.

¶ 76    On appeal, the appellate court found that the language of the handbook and policies was not sufficiently clear to satisfy the first *Duldulao* requirement. The court found that the handbook and policies "merely describe some conduct that may subject an employee to discipline and list certain types of disciplinary action that might be taken." *Frank*, 256 Ill. App. 3d at 366. The court noted that there was no promise to follow a course of progressive discipline in every situation and that the handbook and policies expressly stated that the type of discipline depended entirely on the severity of the offense as determined by the employee's supervisor. *Frank*, 256 Ill. App. 3d at 366. The court conducted a thorough review of existing case law and determined that "a handbook or policy which provides that progressive discipline 'may' be used, but allows for discharge on the first offense for certain serious conduct, does not mandate progressive discipline." *Frank*, 256 Ill. App. 3d at 367. Accordingly, the court held that the language in the handbook and policies did not satisfy the first *Duldulao* requirement. *Frank*, 256 Ill. App. 3d at 369.

¶ 77    We find the analysis in *Frank* instructive. Like the policies at issue in *Frank*, the progressive discipline policy in the case at bar is characterized by the policy itself as a "guideline" and allows for each step to be used without prior warnings being issued, depending on the severity of the conduct. Additionally, there is a provision for immediate termination on the first occurrence of a problem. Thus, there is no promise to follow the course of progressive discipline in every situation. We therefore find that this language does not satisfy the requirements of *Duldao*.

¶ 78 Plaintiff distinguishes the cases finding no contract by arguing that in the case at bar, the language we rely on was removed when the progressive discipline policy was incorporated into the Dynamic Organization policy, making the progressive discipline policy mandatory. As noted, plaintiff provides no factual basis for this argument. Moreover, the progressive discipline policy contained in the record on appeal was created on April 1, 2000, and revised on March 1, 2003, and contains a reference to the Dynamic Organization policy. Plaintiff does not show us how the Dynamic Organization policy removed this language, because it is still contained in the progressive discipline policy well after the Dynamic Organization policy was implemented.

¶ 79 Plaintiff additionally argues that the case at bar is distinguishable from the cases in which no contract was found because, here, "there was a two-tiered approach to any disciplinary action: 1) mandatory progressive discipline for all employees, and 2) a list of specified, for-cause conduct that warranted accelerated discipline." This argument is directly contrary to the language in the progressive discipline policy. First, as we have noted, there is permissive, not mandatory, language in the policy. Furthermore, the list of conduct plaintiff refers to is a list providing examples of conduct warranting immediate disciplinary action, including termination. The policy provides:

> "Not all performance or conduct issues lend themselves to the step-by-step approach outlined above. There are times when immediate disciplinary action, including termination, may be warranted on the first occurrence of the problem. Examples of such cases, *though not all-inclusive,* are described below \*\*\*." (Emphasis added.)

It is explicitly a nonexhaustive list of examples, not a "list of specified, for-cause conduct that warrant[s] accelerated discipline." Thus, the progressive discipline policy is not sufficiently clear to satisfy the first *Duldulao* requirement.

¶ 80 This result becomes clear when examining *Duldulao* itself and the kind of language that does satisfy its requirements. The employee handbook in *Duldulao* stated that after a probationary period, an employee " 'becomes a permanent employee and termination contemplated by the hospital *cannot occur* without proper notice and investigation.' " (Emphasis in original.) *Duldulao*, 115 Ill. 2d at 490-91. Amendments to the handbook provided that "permanent employees '*are never* dismissed without prior written admonitions and/or an investigation that has been properly documented.' " (Emphasis in original.) *Duldulao*, 115 Ill. 2d at 491. Finally, " 'three warning notices within a twelve-month period *are required* before an employee is dismissed, except in the case of immediate dismissal.' " (Emphasis in original.) *Duldulao*, 115 Ill. 2d at 491. The *Duldulao* court noted that the fact that there was a provision for immediate dismissal did not detract from the definiteness of the offer, because there were examples of conduct that was subject to immediate dismissal, as well as examples of conduct that was specifically not subject to immediate dismissal. *Duldulao*, 115 Ill. 2d at 491.

¶ 81 The language in the case at bar is not nearly as definite as the language at issue in *Duldulao*. Instead, like the language in *Frank*, the progressive discipline policy in the case at bar is not sufficiently clear to satisfy the first *Duldulao* requirement. Since it did not satisfy the first requirement, there is no need for us to consider whether it satisfied the other two

requirements. Accordingly, we cannot find that the Dynamic Organization and progressive discipline policy provided a modification of plaintiff's existing employment agreement. Therefore, plaintiff remained an at-will employee and we affirm the trial court's grant of USCC's motion for summary judgment.

¶ 82                                    II. Motion to Dismiss

¶ 83     Plaintiff also argues that the trial court erred in granting USCC's motion to dismiss his claim for promissory estoppel pursuant to section 2-619 of the Code. "A motion to dismiss, pursuant to section 2-619 of the Code, admits the legal sufficiency of the plaintiffs' complaint, but asserts an affirmative defense or other matter that avoids or defeats the plaintiffs' claim." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006); *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). For a section 2-619 dismissal, our standard of review is *de novo*. *Solaia Technology*, 221 Ill. 2d at 579; *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Kahn*, 408 Ill. App. 3d at 578.

¶ 84     When reviewing "a motion to dismiss under section 2-619, a court must accept as true all well-pleaded facts in plaintiffs' complaint and all inferences that can reasonably be drawn in plaintiffs' favor." *Morr-Fitz*, 231 Ill. 2d at 488. "In ruling on a motion to dismiss under section 2-619, the trial court may consider pleadings, depositions, and affidavits." *Raintree Homes, Inc. v. Village of Long Grove*, 209 Ill. 2d 248, 262 (2004). Even if the trial court dismissed on an improper ground, a reviewing court may affirm the dismissal, if the record supports a proper ground for dismissal. *Raintree*, 209 Ill. 2d at 261 (when reviewing a section 2-619 dismissal, we can affirm "on any basis present in the record"); *In re Marriage of Gary*, 384 Ill. App. 3d 979, 987 (2008) ("we may affirm on any basis supported by the record, regardless of whether the trial court based its decision on the proper ground").

¶ 85     In the case at bar, USCC argued that plaintiff's promissory estoppel claim should be dismissed because it was precluded by the existence of the employment agreement and the associate handbook acknowledgments signed by plaintiff. On appeal, plaintiff argues that the trial court erred in granting USCC's motion to dismiss because the claim for promissory estoppel was separate from the employment agreement and handbooks. Instead, he claims that the basis for his promissory estoppel claim is the statements made to USCC employees concerning the 2005 cultural surveys and focus groups.

¶ 86     In order to establish a claim for promissory estoppel, a plaintiff must prove that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009) (citing *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 309-10 (1990)). In the case at bar, plaintiff alleges that the employees completing the cultural surveys and the participants in the focus group meeting were told that their comments would be confidential and that there would be no retaliation. He claims that this promise was sufficient to state a claim for promissory estoppel.

¶ 87     In response, USCC argues that plaintiff cannot state a claim for promissory estoppel as

a matter of law due to the existence of the employment agreement. Additionally, USCC argues that plaintiff cannot demonstrate reasonable reliance on any promises because the employment agreement and the handbook acknowledgments provided that plaintiff's at-will employment status could only be modified through a written agreement.

¶ 88    " '[P]romissory estoppel is a doctrine under which the plaintiff may recover without the presence of a contract.' " *Newton*, 233 Ill. 2d at 53 (quoting *Illinois Valley Asphalt, Inc. v. J.F. Edwards Construction Co.*, 90 Ill. App. 3d 768, 770 (1980)). Thus, a party will generally be barred from seeking redress under the doctrine of promissory estoppel "where the performance which is said to satisfy the requirement of detrimental reliance is the same performance which supplies the consideration for [a] contract." *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 512 (1995). This is so because promissory estoppel is intended to enforce promises that are not supported by consideration; "[i]t is not intended 'to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract.' " *Prentice*, 271 Ill. App. 3d at 512 (quoting *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d 224, 237 (1992)).

¶ 89    USCC argues that the presence of the employment agreement bars the promissory estoppel claim because it is a valid contract. However, the performance giving rise to plaintiff's detrimental reliance in his promissory estoppel claim is not the same performance that supplied the consideration for the contract. Plaintiff alleges that he discussed Irving's performance candidly during the focus group meeting due to USCC's promises that the information would be kept confidential and there would be no retaliation. The consideration for the employment contract was simply plaintiff's promise to work for USCC; candid participation in the cultural surveys and focus groups could not have been part of this consideration, since they did not come into existence until Rooney joined the company in 2000. Accordingly, we do not find that the existence of the employment agreement in itself bars plaintiff's claim for promissory estoppel.

¶ 90    USCC additionally argues that plaintiff cannot demonstrate reasonable reliance given the at-will employment agreement and the handbook acknowledgments that plaintiff signed. We note that USCC does not challenge any other element of the requirements of promissory estoppel other than that one, and it is clear that the other elements are satisfied: plaintiff alleges that USCC promised plaintiff that the comments made in the cultural surveys and during the focus group meeting would be confidential, plaintiff relied on those comments in speaking candidly about Irving's performance, and plaintiff was terminated when Irving discovered the comments. Thus, we must consider whether the third element was satisfied.

¶ 91    The third requirement for establishing a claim for promissory estoppel is that "plaintiff's reliance was expected and foreseeable by defendants." *Newton*, 233 Ill. 2d at 51 (citing *Quake*, 141 Ill. 2d at 309-10). This element can alternately be described as demonstrating plaintiff's justifiable or reasonable reliance on the promise, similarly to the elements required in a claim for fraud. See *Newton*, 233 Ill. 2d at 60. USCC argues that this element cannot be satisfied because the alleged promise would have altered plaintiff's at-will employment status, and plaintiff signed the employment agreement providing that such modification was required to be in writing. However, we cannot agree with USCC's characterization of its promise in such a manner.

-19-

¶ 92 In the case at bar, USCC allegedly promised that it would keep the information plaintiff provided confidential so that employees would provide candid responses. While that promise included a promise that there would be no retaliation for any comments made, which would presumably include a promise that plaintiff would not be terminated for those comments, the promise as a whole was broader than any portion concerning termination. For instance, the results of not holding an employee's negative comments confidential could include such varied results as the supervisor transferring the employee to another department, viewing the employee's work through the eyes of an individual holding a grudge over the comments, or causing future employees not to speak candidly in the meetings or in their cultural survey responses. There is no indication that the promise focused on the employment aspect such that plaintiff would have been expected to believe that it was changing his at-will employment status.

¶ 93 For this reason, we find USCC's reliance on *Ross*, 377 Ill. App. 3d 387, to be unpersuasive. In *Ross*, the plaintiff argued that he was wrongfully terminated in violation of his employee handbook, which he claimed created a contract between him and his employer; the plaintiff further argued that his termination was in violation of oral promises made to him by the company. *Ross*, 377 Ill. App. 3d at 388. The plaintiff's promissory estoppel claim centered on a manager's statement that plaintiff would remain employed as long as he wished to work. *Ross*, 377 Ill. App. 3d at 394. The trial court dismissed the plaintiff's claim, and the appellate court affirmed the dismissal, based on the third element of promissory estoppel. *Ross*, 377 Ill. App. 3d at 394. The trial court found that the plaintiff had not sufficiently alleged reasonable reliance on the manager's statements, given that every handbook issued to the plaintiff included an explicit disclaimer informing employees that the only person who could alter their employment status was the senior vice president of human resources. *Ross*, 377 Ill. App. 3d at 394.

¶ 94 In the case at bar, the promise allegedly made to plaintiff did not center around a change in plaintiff's at-will employment status, as was the case in *Ross*. Instead, the portion of the promise concerning termination was a small part of a broader promise to keep the information confidential. Accordingly, for the purpose of USCC's motion to dismiss, we find that the employment agreement and handbook acknowledgments did not preclude plaintiff's promissory estoppel claim and we reverse the trial court's grant of the motion to dismiss.

¶ 95                               III. Rule 191(b) Motion

¶ 96 Finally, plaintiff argues that he should have been permitted to depose Banks-Giles and Rooney pursuant to Rule 191(b). Discovery rulings are within the trial court's discretion and will not be overturned absent an abuse of discretion. *Redelmann v. Claire-Sprayway, Inc.*, 375 Ill. App. 3d 912, 927 (2007). Trial courts are vested with wide discretion in ruling on discovery matters, and a reviewing court will not disturb a trial court's discovery rulings absent an abuse of that discretion. *Pemberton v. Tieman*, 117 Ill. App. 3d 502, 504-05 (1983). A trial court abuses its discretion only when "no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005).

¶ 97     Rule 191(b) applies both to motions for summary judgment and motions to dismiss pursuant to section 2-619 and provides:

> "If the affidavit of either party contains a statement that any of the material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise, naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief, the court may make any order that may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtained, or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing papers or documents in the possession of those persons or furnishing sworn copies thereof. The interrogatories and sworn answers thereto, depositions so taken, and sworn copies of papers and documents so furnished, shall be considered with the affidavits in passing upon the motion." Ill. S. Ct. R. 191(b) (eff. July 1, 2002).

¶ 98     In the case at bar, plaintiff argues that he should have been afforded the opportunity to depose Banks-Giles and Rooney under Rule 191(b). However, plaintiff did not comply with the requirements of Rule 191(b). Under Rule 191(b), plaintiff was permitted to file an affidavit in opposition to USCC's motion for summary judgment and to dismiss stating that material facts which should appear in the affidavit are known only to those persons whose affidavits he was unable to procure. Instead, plaintiff filed a "Rule 191(b) Motion for Discovery Re: Defendant's Motion for Summary Judgment and Section 2-619 Motion to Dismiss." Even if plaintiff's motion could be used in place of the required affidavit, plaintiff's motion does not state what he believed Rooney and Banks-Giles would testify to if sworn. The trial court in its reasonable discretion could certainly deny a "fishing expedition." Accordingly, we do not find that the trial court abused its discretion in denying plaintiff's motion.

¶ 99     Moreover, the trial court did not deny plaintiff's motion in its entirety. In fact, plaintiff's counsel was permitted to ask questions at Rooney's deposition in Wendt's case and the trial court incorporated that deposition into the case at bar. That deposition testimony contained Rooney's answers to a number of questions concerning the Dynamic Organization and the progressive discipline policy. Plaintiff does not suggest what additional information could have been gained from also deposing Rooney in his case, other than arguing that he should have had that opportunity. Thus, we cannot find that the trial court abused its discretion and affirm its decision to deny plaintiff's motion.

¶ 100                                   CONCLUSION

¶ 101    For the reasons set forth above, we affirm the trial court's grant of summary judgment in USCC's favor on count I of the complaint, reverse its grant of USCC's motion to dismiss count II of the complaint, and affirm its denial of plaintiff's discovery motion.

¶ 102    Affirmed in part and reversed in part; cause remanded.

¶ 103    JUSTICE GARCIA, dissenting in part:

¶ 104    I find no basis to conclude that the plaintiff's promissory estoppel claim can be separated from his claim that the employment agreement and handbooks changed the plaintiff's status as an "at-will" employee, which we correctly reject. The purported promise to the plaintiff that his comments made at the focus group meeting would remain confidential and, implicitly, he would not face termination based on his candid discussion is insufficient to allege a promissory estoppel claim to dispute his termination precisely because he remained an at-will employee. The employment agreement expressly provides that it "may be amended or modified only by written agreement signed by Employee and an officer of Company," which clearly did not occur.

¶ 105    The offered distinction by the plaintiff to avoid the holding of *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505 (1995), that "the performance giving rise to plaintiff's detrimental reliance in his promissory estoppel claim is not the same performance that supplied the consideration for the contract," I find unpersuasive. *Supra* ¶ 89. Illinois law is as stated in *Prentice*: "[O]nce it is established, either by an admission of a party or by a judicial finding, that there is in fact an enforceable contract between the parties and therefore consideration exists, then a party may no longer recover under the theory of promissory estoppel." *Prentice*, 271 Ill. App. 3d at 512. There is no dispute that the plaintiff and the defendant were bound to a written employment agreement. I cannot agree that the terms of the agreement can be overridden by a claim of promissory estoppel. Affirming the grant of the defendant's motion to dismiss is also consistent with our holding in *Ross v. May Co.*, 377 Ill. App. 3d 387, 394 (2007) (plaintiff did not sufficiently allege "the elements for promissory estoppel because he could not establish that he reasonably relied upon the [oral] statements").

¶ 106    I dissent from the majority's decision to reverse the trial court's grant of the defendant's motion to dismiss count II of the complaint.