# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880

---

| | |
|---|---|
| Appellate Court Caption | URBAN SITES OF CHICAGO, LLC, Plaintiff-Appellant, v. CROWN CASTLE USA, a Foreign Corporation, and T-MOBILE USA, INC., a Foreign Corporation, Defendants-Appellees (T-Mobile USA, Inc., a Foreign Corporation, Cross-Plaintiff-Appellee and Third-Party Plaintiff-Appellee; Crown Castle USA, a Foreign Corporation, Cross-Defendant-Appellee; Global Signal Acquisitions II, LLC, Third-Party Defendant-Appellee). |
| District & No. | First District, First Division<br>Docket No. 1-11-1880 |
| Filed | October 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Summary judgment was properly entered against plaintiff lessor in an action challenging the dimensions of the property that plaintiff leased to defendants' predecessors in interest and that was subsequently assigned to defendants, since plaintiff failed to raise a genuine issue of material fact sufficient to survive summary judgment. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-19588; the Hon. Leroy K. Martin, Jr., Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Robert Habib and Jason Knuckey, both of Chicago, for appellant. |
|---|---|
| | Michael Best & Friedrich, LLP, of Chicago (Michael A. Stiegel and Christopher R. Parker, of counsel), for appellees Crown Castle USA and Global Signal Acquisitions II, LLC. |
| | Momkus McCluskey, LLC, of Lisle (James S. Harkness, of counsel), for appellee T-Mobile USA, Inc. |
| Panel | JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion. |
| | Presiding Justice Hoffman and Justice Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1     This appeal arises from the March 25, 2011 order entered by the circuit court of Cook County, which entered summary judgment in favor of defendants Crown Castle USA (Crown Castle), Global Signal Acquisitions II, LLC (GSA), and T-Mobile USA, Inc. (T-Mobile), and against plaintiff Urban Sites of Chicago, LLC (Urban Sites). This appeal also arises from the circuit court's June 3, 2011 order denying Urban Sites' motion to reconsider the court's March 25, 2011 ruling. On appeal, Urban Sites argues that the circuit court erroneously granted summary judgment against it. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 2                                        BACKGROUND

¶ 3     Plaintiff Urban Sites owns commercial property at 7010 South Stony Island Avenue in Chicago, Illinois (the property). In October 1999, Urban Sites entered into a lease agreement with SprintCom, Inc. (Sprint),[1] whereby Urban Sites leased a portion of the property to Sprint for the purpose of constructing equipment and an antenna structure on the leased area (the Sprint lease). Under the terms of the Sprint lease, Sprint agreed to pay $9,600 annually in rent to Urban Sites for the leased area, with an increase of 15% in the annual rent rate after each five-year renewal term. The original site plan of the leased area agreed to under the Sprint lease consisted of an area with dimensions of 25 by 50 feet, with a separate 25-foot easement located across the rear of the property (the original site plan). Both the Sprint lease and the original site plan were signed by representatives of Urban Sites and Sprint.

---

[1]Sprint is not a party in this appeal.

¶ 4     In a letter dated July 25, 2000, Urban Sites proposed to Sprint that the dimensions of the leased area be revised to 25 by 32 feet, and forwarded a copy of the proposed amended site plan to Sprint. Although the proposed amended site plan was signed by a representative of Urban Sites, it was never signed by any representative of Sprint.

¶ 5     On August 11, 2000, Sprint responded to Urban Sites' July 25, 2000 letter by proposing to reduce the leased area to 25 by 34 feet, with an 18-foot easement located adjacent to an alley in the rear of the property (the reduced site plan). The reduced site plan was signed by representatives of both Urban Sites and Sprint. Sprint's letter stated that the reduced site plan "renders null and void the previous site description." Although the reduced site plan decreased the size of the leased area under the Sprint lease, Sprint continued to pay the same rent rate to Urban Sites as originally agreed upon by the parties.

¶ 6     On December 3, 2000, Urban Sites entered into a lease agreement with Nextel West Corp. (Nextel),[2] by which Urban Sites agreed to lease another area of the property to Nextel (the Nextel lease). The "description of premises" attached to the Nextel lease depicted Nextel's leased area to be immediately adjacent to Sprint's leased area, and shows Sprint's leased area to be the dimensions reflected in the reduced site plan–25 by 34 feet.

¶ 7     Subsequently, in 2001, Sprint subleased a portion of its leased area of the property to a predecessor[3] of T-Mobile. The sublease between Sprint and the predecessor of T-Mobile was later assigned to T-Mobile, which placed its equipment on the subleased site. Although the exact details are unclear in the record, Sprint ultimately assigned its interest in the Sprint lease to GSA and Crown Castle.[4]

¶ 8     On March 1, 2005, Urban Sites entered into an agreement with Sprint entitled "Agreement Regarding Ground Lease," in connection with Sprint's pending assignment of its interest in the property to GSA (the 2005 agreement). The 2005 agreement stated in pertinent part the following:

> "For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:
>
> * * *
>
> 2. *Estoppel Certificate*: Landlord [Urban Sites] certifies that (and Lender may rely on such representations) the following statements are true as of the date hereof:
>
> (a) Tenant [Sprint] is the current tenant under the [Sprint lease] (a full copy of which, including all amendments thereto, is annexed as *Exhibit A*), and the [Sprint lease] is in

---

[2]Nextel is not a party in this appeal.

[3]It is unclear in the record what entity was the predecessor of T-Mobile. However, the record indicates that T-Mobile's predecessor eventually "merged into" T-Mobile.

[4]Some pleadings in the record described Sprint to have assigned its interest in the Sprint lease to both GSA and Crown Castle, as assignees-successors of the lease, while other pleadings described Crown Castle as an affiliate to assignee-successor GSA. Our resolution of the issues in this appeal does not bear upon these discrepancies.

full force and effect and contains the entire agreement between [Urban Sites] and [Sprint] with respect to the [p]roperty.

(b) No default exists under the [Sprint lease] on the part of [Sprint], and, to [Urban Sites'] knowledge, no event or condition has occurred or exists which *** would constitute a default by [Sprint] under the [Sprint lease].

* * *

6. *Miscellaneous*

(a) If this [a]greement is inconsistent with the [Sprint lease], this [a]greement shall control.

(b) This [a]greement shall be binding upon [Urban Sites] and its successors and shall benefit each of [l]ender and [s]ubtenant and their respective successors and assigns.

(c) This [a]greement may not be amended or modified except by a written agreement executed by [Urban Sites], any [l]ender and [s]ubtenant." (Emphases in original.)

Included as Exhibit A to the 2005 agreement was a copy of the Sprint lease along with two copies of the original site plan which depicted Sprint's leased area as 25 by 50 feet in size. Jerald Much (Much), as manager of Urban Sites, executed the 2005 agreement on behalf of Urban Sites and initialed each page of the 2005 agreement, including the attached copies of the original site plan.

¶ 9        On April 16, 2009, Urban Sites sent a "Demand for Possession" letter to T-Mobile, stating that it had come to Urban Sites' attention that, since March 2004, T-Mobile had erected a "communications facility" on part of the property that Crown Castle had not leased from Urban Sites. The letter also stated that the area of the property that T-Mobile had wrongfully occupied was valued at $1,500 per month, and that T-Mobile owed Urban Sites $93,000 to date. In a letter dated May 29, 2009, T-Mobile responded that it had a right to possess the subleased premises at issue because the subleased premises were located entirely within the 25 by 50-foot area of the Sprint lease. T-Mobile's equipment was located within the 25 by 50-foot area set forth in the original site plan, but outside of the 25 by 34-foot area described in the reduced site plan.

¶ 10       On June 18, 2009, Urban Sites filed a two-count complaint for ejectment against T-Mobile (count I), and for unjust enrichment against Crown Castle (count II). In the complaint, Urban Sites alleged that Crown Castle, without Urban Sites' knowledge or consent, permitted T-Mobile to place its equipment in the easement area of the property. On October 26, 2009, T-Mobile filed a cross-claim against Crown Castle for breach of contract, and filed a third-party complaint against GSA for breach of contract.

¶ 11       On December 13, 2010, Crown Castle and GSA filed a joint motion for summary judgment. First, the motion for summary judgment asserted that Urban Sites admitted under the "estoppel certificate" of the 2005 agreement that the dimensions of the original site plan (25 by 50 feet), rather than the reduced site plan (25 by 34 feet), were in full force and effect, and that Urban Sites should be estopped from claiming trespass. Second, the motion for summary judgment argued, in the alternative, that the 2005 agreement, with the attached copies of the original site plan, constituted a modification of the Sprint lease which changed

the leased area set forth in the reduced site plan (24 by 34 feet) back to the larger dimensions of the original site plan (25 by 50 feet). On December 27, 2010, T-Mobile also filed a motion for summary judgment, which adopted and incorporated the arguments made in Crown Castle and GSA's motion for summary judgment.

¶ 12    In response to the motions for summary judgment, Urban Sites argued that it mistakenly executed the estoppel certificate in the 2005 agreement without realizing that the original site plan, rather than the reduced site plan, was attached to the 2005 agreement. Urban Sites further argued that the estoppel certificate was executed "for the benefit of [a] lender" in procuring financing for GSA, that it was not intended to modify the terms of the Sprint lease, and that there was no meeting of the minds between the parties to allow for such a modification.

¶ 13    On March 25, 2011, after hearing the parties' arguments on the motions for summary judgment, the circuit court granted Crown Castle, GSA and T-Mobile's motions for summary judgment "based on the clear language of the estoppel agreement dated March 1, 2005, and executed by [Urban Sites]," and dismissed the case with prejudice. However, no transcript or bystander's report of the March 25, 2011 hearing on the motions for summary judgment is contained in the record before us on appeal.

¶ 14    On April 25, 2011, Urban Sites filed a motion to reconsider the circuit court's March 25, 2011 ruling, arguing that there was no consideration to effectuate a valid modification of Sprint's leased area from 20 by 34 feet to a size of 20 by 50 feet.

¶ 15    On June 3, 2011, the circuit court denied Urban Sites' motion to reconsider:

"One could see a benefit to [Urban Sites] when we are speaking in terms of consideration inasmuch as there was, in my opinion, a benefit to [Urban Sites] for the defendant to get this financing that we have spoken about in the agreement ***.

* * *

While I understand the argument, we had [*sic*] discussion the last time. Back in March we discussed this matter about consideration. It was my determination reading that document that one was estopped, that the document, itself, clearly set forth what the conditions were and the affirmations made by Urban Sites *** regarding the attachment of the lease, and that being the true and accurate circumstance of the agreement that existed here, I just don't see any basis to change my earlier ruling."

¶ 16    On June 30, 2011, Urban Sites filed a notice of appeal before this court.

¶ 17                                ANALYSIS

¶ 18    We determine whether the circuit court erred in granting summary judgment against Urban Sites.

¶ 19    Urban Sites raises a number of arguments as to the propriety of the circuit court's entry of summary judgment against it and the court's denial of Urban Sites' motion to reconsider. Specifically, Urban Sites contends that the 2005 agreement could not modify the terms of the Sprint lease to the larger dimensions of the leased area because there was no consideration between the parties; that the estoppel certificate in the 2005 agreement could not be used to

modify the Sprint lease; and that the parties had no meeting of the minds to modify the Sprint lease.

¶ 20    Crown Castle, GSA and T-Mobile[5] counter that Urban Sites was estopped from bringing its claims based on the clear language of the 2005 agreement and that Urban Sites was not relieved of the legal consequences of its unilateral mistake in executing the 2005 agreement without verifying whether the attached copies of the original site plan reflected the accurate dimensions of the leased area. They further maintain that Urban Sites misdirects most of its arguments to suggest that the 2005 agreement was an invalid modification of the Sprint lease, even though the circuit court had made clear that its decision to grant the motion for summary judgment was based on the plain language of the 2005 agreement rather than on the alternative theory that it was a modification of the Sprint lease. Moreover, they contend that even if the theory of modification had been the basis for the circuit court's ruling, the 2005 agreement was supported by adequate consideration and a meeting of the minds between the parties to modify the dimensions of the leased area under the Sprint lease from 25 by 34 feet to 25 by 50 feet.

¶ 21    The record is devoid of any transcripts or certified bystander's reports of the March 25, 2011 proceedings in which the circuit court granted summary judgment in favor of Crown Castle, GSA and T-Mobile. As the appellant, Urban Sites had the burden to provide a sufficiently complete record to support any claim of error. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984). In the absence of a complete record on appeal, any doubts which may arise will be resolved against the appellant, and "it will be presumed that the order entered by the [circuit] court was in conformity with law and had a sufficient factual basis." *Id.* at 392. In the March 25, 2011 written order, the circuit court stated that it was granting the motions for summary judgment "based on the clear language of the estoppel agreement dated March 1, 2005, and executed by [Urban Sites]." However, Urban Sites' arguments on appeal primarily center on the theory that there was an invalid modification of the terms of the Sprint lease, which, in the limited record before us, did not seem to have been a basis for the court's ruling. Because there are no transcripts of the hearing on the motions for summary judgment, or a certified bystander's report in lieu thereof, any doubt that the circuit court based its ruling on the plain language of the 2005 agreement, rather than on the alternative theory that there was a valid modification of the Sprint lease terms, is resolved against Urban Sites and we will presume that the circuit court acted in conformity with the law. Further, we may affirm the circuit court's entry of summary judgment on any basis appearing in the record, "whether or not the [circuit] court relied on that basis or its reasoning was correct." (Internal quotation marks omitted.) *Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938, ¶ 26.

¶ 22    As a preliminary matter, Urban Sites argues that Crown Castle and GSA's motion for summary judgment should have been denied on its face because it was unaccompanied by affidavits or sworn pleadings. See Ill. S. Ct. R. 191(a) (eff. July 1, 2002). However, the record shows that Crown Castle and GSA, in their joint reply in support of their motion for

---

[5]Crown Castle, GSA and T-Mobile filed a joint brief on appeal.

summary judgment, supplied the necessary verified pleadings to the court to substantiate the factual allegations made in their motion for summary judgment. See *Larson v. Decatur Memorial Hospital*, 236 Ill. App. 3d 796, 802 (1992) (all pleadings, depositions, admissions on file and affidavits submitted by the parties in support of, or in opposition to, a motion for summary judgment must comply with Rule 191(a) in order to be considered; in determining the genuineness of a fact for summary judgment, a court may consider only facts admissible in evidence). Moreover, as discussed, because no transcripts or a bystander's report of the hearing on the motion for summary judgment was provided in the record on appeal, we must presume that the circuit court acted in conformity with the law in refusing to deny summary judgment on that basis.

¶ 23 Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). "The purpose of summary judgment is not to try a question of fact, but to determine whether one exists" that would preclude the entry of judgment as a matter of law. *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 421, 432 (2002). "Thus, although the nonmoving party is not required to prove his case in response to a motion for summary judgment, he must present a factual basis that would arguably entitle him to judgment." *Id.* at 432. We review the circuit court's decision to grant the motions for summary judgment *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). Further, this case concerns the interpretation of a lease by the circuit court as a matter of law, which we also review *de novo*. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 129 (2005).

¶ 24 A lease is a contract between the landlord and tenant and normal principles of contract interpretation apply. *Midland Management Co. v. Helgason*, 158 Ill. 2d 98, 103 (1994); *Clarendon America Insurance Co. v. Prime Group Realty Services, Inc.*, 389 Ill. App. 3d 724, 729 (2009), (citing *Sears, Roebuck & Co. v. Charwil Associates, Ltd. Partnership*, 371 Ill. App. 3d 1071, 1076 (2007)). The principal objective in construing a contract is to determine and give effect to the intention of the parties at the time they entered into the agreement. *Fleet Business Credit, LLC v. Enterasys Networks, Inc.*, 352 Ill App. 3d 456, 469 (2004) (citing *Schweihs v. Davis, Friedman, Zavett, Kane & MacRae*, 344 Ill. App. 3d 493, 500 (2003), *Zale Construction Co. v. Hoffman*, 145 Ill. App. 3d 235, 241 (1986), and *Ancraft Products Co. v. Universal Oil Products Co.*, 100 Ill. App. 3d 694, 697 (1981)). To determine the intent of the parties, the court must look to the instrument itself. *Fleet Business Credit*, 352 Ill. App. 3d at 469. A court must look at the plain and ordinary meaning of the terms of a contract. *Fan v. Auster Co.*, 389 Ill. App. 3d 633, 648 (2009). "When a dispute exists between the parties as to the meaning of a contract provision, the threshold issue is whether the contract is ambiguous." *Fleet Business Credit*, 352 Ill. App. 3d at 469 (citing *Installco, Inc. v. Whiting Corp.*, 336 Ill. App. 3d 776, 783 (2002)). Contractual language is ambiguous when it is " ' "susceptible to more than one meaning [citation] or is obscure in meaning through indefiniteness of expression." ' " *Fleet Business Credit*, 352 Ill. App. 3d at 469

(quoting *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill. App. 3d 305, 310 (2002), quoting *Wald v. Chicago Shippers Ass'n*, 175 Ill. App. 3d 607, 617 (1988)). An ambiguity is not created simply because the parties do not agree upon an interpretation. *Fleet Business Credit*, 352 Ill. App. 3d at 469 (citing *Groshek v. Frainey*, 274 Ill. App. 3d 566, 569 (1995), *Zale Construction*, 145 Ill. App. 3d at 241, and *Harlem-Irving Realty, Inc. v. Alesi*, 99 Ill. App. 3d 932, 936 (1981)). Illinois courts follow the "four corners" rule when interpreting contracts, which requires that " ' "[a]n agreement, when reduced to writing, must be presumed to speak the intention of the parties who signed it. It speaks for itself, and the intention with which it was executed must be determined from the language used. It is not to be changed by extrinsic evidence." ' " *Fleet Business Credit*, 352 Ill. App. 3d at 469-70 (quoting *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999), quoting *Western Illinois Oil Co. v. Thompson*, 26 Ill. 2d 287, 291 (1962)).

¶ 25    We agree with the circuit court's ruling that Urban Sites was estopped from bringing its cause of action based on the clear and unambiguous language of the 2005 agreement, which included an estoppel certificate, and we find that Urban Sites has not raised a genuine issue of material fact to survive summary judgment.

¶ 26    An estoppel certificate is a signed statement by a party, such as a landlord, certifying for another's benefit that certain facts pertaining to the tenancy are correct. *K's Merchandise Mart, Inc. v. Northgate Ltd. Partnership*, 359 Ill. App. 3d 1137, 1143 (2005). Estoppel certificates are widely used in commercial real estate transactions and are important in preserving and enhancing the marketability of commercial property. *Id.* "A party's delivery of this statement estops that party from later claiming a different state of facts." (Internal quotation marks omitted.) *Id.* A purpose of an estoppel certificate is to give assurance that the party making the estoppel statement "at a later date will not make claims that are inconsistent with the statements contained in the estoppel [certificate]." (Internal quotation marks omitted.) *Id.* Moreover, "[a] party who executes an estoppel certificate will not be allowed to raise claims of which it knew or should have known at the time the certificate was executed." *Id.* at 1144.

¶ 27    Under the plain language of the 2005 agreement, the estoppel certificate expressly stated that "(a) Tenant [Sprint] is the current tenant under the [Sprint lease] (a full copy of which, including all amendments thereto, is annexed as *Exhibit A*), and the [Sprint lease] is in full force and effect and contains the entire agreement between [Urban Sites] and [Sprint] with respect to the [p]roperty." Attached to the 2005 agreement was a copy of the Sprint lease along with two copies of the original site plan which depicted Sprint's leased area as 25 by 50 feet in size, with a 25-foot easement across the rear of the property. Urban Sites admits that its manager, Much, executed the 2005 agreement on behalf of Urban Sites and initialed each page of the documents, including the two attached copies of the original site plan. Thus, under the plain language of the 2005 agreement, Urban Sites had represented that the original site plan was in full force and effect on the date that Much executed the 2005 agreement.

¶ 28    Because Urban Sites' representation that the original site plan was in place at the time the 2005 agreement was executed was clear and unambiguous, Urban Sites is estopped from claiming something else now. See *id.* at 1143 ("[i]n Illinois, a written contract is presumed to include all material terms agreed upon by the parties, and any prior negotiations or

-8-

representations are merged into that agreement; extrinsic evidence, parol or otherwise \*\*\* is generally inadmissible to alter, vary, or contradict the written instrument"); see also *Fundus America (Atlanta) Ltd. Partnership v. RHOC Consolidation, LLC*, 720 S.E.2d 176, 181 (Ga. Ct. App. 2011) (the court found the estoppel certificate to be unambiguous and as such, the court held that it "cannot consider parol evidence to add to, take from, contradict or vary the \*\*\* contract containing the terms of the [e]stoppel [c]ertificate").

¶ 29 This is particularly true given that Urban Sites represented in the 2005 agreement that the attached Sprint lease and copies of the original site plan were in full force and effect, contained the entire agreement between Urban Sites and Sprint, and that Urban Sites was bound by the agreement. See *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 464 (1999) ("where parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence"). Furthermore, the plain language of the 2005 agreement expressly stated that, in the event that the 2005 agreement was inconsistent with the terms of the Sprint lease, the 2005 agreement *shall* control. As such, based on the clear language of the 2005 agreement, the circuit court correctly found that Urban Sites had agreed that the original site plan remained in effect, and Urban Sites has not raised a genuine issue of material fact as to this claim.

¶ 30 In an attempt to circumvent the clear and unambiguous terms of the estoppel certificate in the 2005 agreement, Urban Sites relies on *K's Merchandise Mart, Inc.*, to support its contention that the estoppel certificate wrongly "modified" the Sprint lease terms.

¶ 31 In *K's Merchandise Mart, Inc.*, the reviewing court expressed the importance of holding a party to its representations in an estoppel certificate. *K's Merchandise Mart, Inc.*, 359 Ill. App. 3d at 1144. In that case, the new landlord tried to enforce the imposition of management fees on the tenant, K's Merchandise. *Id.* at 1140. The new landlord relied on a lump-sum figure in an estoppel certificate, which was identified as common area charges, and argued that this sum also included management fees. *Id.* at 1144. Although management fees were never expressly identified in the estoppel certificates, the new landlord argued that documents sent to the tenant prior to the execution of the estoppel certificate explained what expenses and costs the lump-sum figure was comprised of, including a line item for management fees. *Id.* In rejecting the new landlord's argument, the court noted that the estoppel certificate did not address management fees, and thus, no modification of the lease was allowed or considered by the court. *Id.* at 1145. It found that the facts showed that the management fees were not disclosed in the lease, or expressly identified in the estoppel certificate, and that there was no prior course of payment of any management fees by K's Merchandise. *Id.* Further, the court found that the documents containing a line item for management fees, which were sent to the tenant prior to the execution of the estoppel certificate, were not sufficient to bind the tenant to pay the management fees. *Id.* at 1144.

¶ 32 Unlike *K's Merchandise Mart, Inc.*, here, Sprint did not try to implement an undisclosed term without providing notice to Urban Sites but, instead, provided conspicuous notice of the dimensions of the original site plan to Urban Sites. The 2005 agreement had attached to it a copy of the Sprint lease and two copies of the original site plan, which set forth the specific dimensions of the leased site as 25 by 50 feet. Moreover, Urban Sites'

-9-

representative, Much, initialed every page of the 2005 agreement–including both copies of the attached original site plan. Therefore, we find Urban Sites' argument to be unpersuasive and no genuine issues of material fact existed to support reversal of the circuit court's ruling on this basis. Accordingly, the circuit court properly entered summary judgment in favor of Crown Castle, GSA and T-Mobile.

¶ 33    Even assuming, *arguendo*, that the circuit court's basis for its ruling had been on the alternative theory of modification of the terms of the Sprint lease, rather than on the plain language of the 2005 agreement as discussed, our holding would remain unchanged.

¶ 34    Urban Sites argues that the 2005 agreement could not modify the terms of the Sprint lease by increasing the dimensions of the leased area from 25 by 34 feet to 25 by 50 feet because it was not supported by consideration.

¶ 35    The 2005 agreement provided that the parties entered into the agreement "[f]or good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." Under Illinois law, a valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration. *Janda v. United States Cellular Corp.*, 2011 IL App (1st) 103552, ¶ 62; *Scutt v. La Salle County Board*, 97 Ill. App. 3d 181, 185 (1981) (modification of a contract is itself a contract and only enforceable where ordinary standards of contract law are satisfied). Hence, no contract can be modified in *ex parte* fashion by one of the contracting parties without the knowledge and consent of the remaining party to the agreement (*Brooks v. Village of Wilmette*, 72 Ill. App. 3d 753, 756 (1979); *Hulcher v. Adcock*, 25 Ill. App. 2d 255 (1960) (abstract of op.)) thereby making mutual assent as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract. *Keco Industries, Inc. v. ACF Industries, Inc.*, 316 F.2d 513, 515 (4th Cir. 1963); *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469 (2004).

¶ 36    A "modification" of a contract is a change in one or more respects which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect undisturbed. *Hartwig Transit, Inc. v. Menolascino*, 113 Ill. App. 3d 165, 170 (1983); *International Business Lists, Inc. v. American Telephone & Telegraph Co.*, 147 F.3d 636, 640 (7th Cir. 1998) (applying Illinois law); see *Schwinder*, 348 Ill. App. 3d at 469 ("[t]he modified contract is regarded as creating a new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed"). Modification of a contract normally occurs when the parties agree to alter a contractual provision or to include additional obligations, while leaving intact the overall nature and obligations of the original agreement. See *Hartwig*, 113 Ill. App. 3d at 170.

¶ 37    Parties to a contract may not be locked into its terms forever. Accordingly, parties to an existing contract may, by mutual assent, modify a contract provided that the modification does not violate the law or public policy. 17A Am. Jur. 2d *Contracts* § 500 (2004). It is entirely competent for parties to a contract to modify or waive their rights under it and embed new terms. See *Canale v. Hulcher*, 85 Ill. App. 2d 9 (1967) (abstract of op.). Furthermore, parties to a contract are ordinarily as free to change it after making it as they were to make

it in the first instance. Restatement of Contracts § 408 (1936).

¶ 38    A modification of an existing contract, like a newly formed contract, requires consideration to be valid and enforceable. *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 112 (1999). Consideration consists of some detriment to the offeror, some benefit to the offeree, or some bargained-for exchange between them. *A. Epstein & Sons International, Inc. v. Eppstein Uhen Architects, Inc.*, 408 Ill. App. 3d 714, 720 (2011). "Any act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract." *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 330 (1977).

¶ 39    In this case, Urban Sites argues that there was inadequate consideration to support a valid modification of the Sprint lease. However, the evidence contained in the record establishes that there was adequate consideration as a matter of law. The 2005 agreement plainly states that the parties entered into the 2005 agreement "[f]or good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged." Urban Sites' representative, Much, executed the agreement and affirmed this representation by initialing each page of the documents. Further, under the "miscellaneous" section of the 2005 agreement, Urban Sites also represented that "[t]his [a]greement shall be binding upon [Urban Sites] and its successors." Based on the unambiguous representations on the face of the 2005 agreement, the evidence establishes that there was consideration as a matter of law. See *K's Merchandise Mart, Inc.*, 359 Ill. App. 3d at 1142 (it is well settled that parol evidence is inadmissible to take from, vary or contradict an unambiguous written contract).

¶ 40    Urban Sites admits that it mistakenly executed the 2005 agreement without realizing that copies of the original site plan were attached to it. Urban Sites makes this statement despite the fact that its representative, Much, had initialed each page of the 2005 agreement including the copies of the original site plan which depicted the Sprint lease area as 25 by 50 feet in size. Urban Sites' unilateral mistake is not a defense and cannot be a basis to reverse the circuit court's finding of estoppel based upon Urban Sites' conduct. See *Harney-Morgan Cheverolet Olds Co. v. Rabin*, 118 Ill. App. 3d 602, 606 (1983). "[T]he unilateral mistake of one party to a contract may not be relied upon to relieve that party from the obligations of the contract where the party's own negligence and lack of prudence resulted in the mistake." *Id.* A party to an agreement is charged with knowledge of and assent to the agreement signed. *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 150 (2006). The failure to read a document before signing it is normally no excuse for the party who signs it. *Breckenridge v. Cambridge Homes, Inc.*, 246 Ill. App. 3d 810, 819 (1993). It follows that, in the absence of fraud, where a person could have read a contract and ascertained the accuracy of the documents, but neglected to do so, he may not avoid the legal consequences of the executed contract on the ground that the signing was done without knowledge of its contents. See generally *Prueter v. Bork*, 105 Ill. App. 3d 1003, 1006 (1981). Further, a mistake made solely by one party is not adequate grounds for relief when the other party is not aware of the mistake. See *Rock Island Bank & Trust Co. v. Stauduhar*, 59 Ill. App. 3d 892, 898 (1978).

¶ 41    Here, Urban Sites, as an experienced and sophisticated commercial landlord, was under a duty to read the 2005 agreement and to learn of the contents of the attached documents before signing them. See *Mt. Zion State Bank & Trust v. Weaver*, 226 Ill. App. 3d 783, 787

(1992); *Magnus v. Lutheran General Health Care System*, 235 Ill. App. 3d 173, 184 (1992); see also *Northern Trust Co. v. VIII South Michigan Associates*, 276 Ill. App. 3d 355, 368 (1995). Urban Sites has made no showing that the inclusion of the original site plans in the 2005 agreement was due to fraud on the part of Sprint at the time that the agreement was executed. Accordingly, Crown Castle and GSA, as assignees and successors of the Sprint lease, and T-Mobile, as assignee of the sublease of the leased property, cannot be held responsible for Urban Sites' unilateral mistake in failing to properly review the terms of the 2005 agreement prior to its execution. See generally *Illinois Tool Works, Inc. v. Commerce & Industry Insurance Co.*, 2011 IL App (1st) 093084, ¶ 20 ("[An] assignee receives all the assignor's right, title or interest in the thing assigned and can claim no greater right or interest than the assignor possessed.").

¶ 42    Furthermore, Urban Sites has presented no evidence to refute the existence of valid consideration in the 2005 agreement. Urban Sites simply made an unsupported claim about a lack of consideration but such unsupported argument cannot be used to create an issue of fact. See *Turner v. City of Chicago*, 91 Ill. App. 3d 931, 937 (1980) ("[m]erely alleging that there exists a genuine issue of material fact does not create such an issue"). Although Urban Sites submitted an affidavit by Much for the first time in its motion to reconsider, claiming that no consideration was given, we note that the affidavit was not part of the summary judgment process and was Urban Sites' only attempt to present a basis for its lack of consideration argument. We cannot consider this document because the scope of appellate review of a summary judgment motion is limited to the record as it existed when the circuit court ruled on the summary judgment motion. *Campos v. Campos*, 342 Ill. App. 3d 1053, 1066 (2003).

¶ 43    Urban Sites further raises the preexisting duty rule to suggest that there was no consideration. "The preexisting duty rule provides that where a party does what it is already legally obligated to do, there is no consideration as there is no detriment." *White v. Village of Homewood*, 256 Ill. App. 3d 354, 357 (1993). "Consideration cannot flow from an act performed pursuant to preexisting legal duty." *Id.*

¶ 44    Despite Urban Sites' claim, the preexisting duty rule is not applicable in the instant case. By entering into the 2005 agreement, Urban Sites was to receive the benefit that GSA, as the then-pending assignee of Sprint's interest in the property, could secure financing for the purchase of the lease rights in order to ensure Urban Sites that there would continue to be a viable tenant to pay rent well into the future. Although the circuit court did not ultimately rely upon this fact in its ruling, it indicated during the hearing on the motion to reconsider that it had considered such evidence:

   "One could see a benefit to [Urban Sites] when we are speaking in terms of consideration inasmuch as there was, in my opinion, a benefit to [Urban Sites] for the defendant to get this financing that we have spoken about in the agreement ***."

¶ 45    Urban Sites asserts that it has suffered a detriment in the loss of land and rent, while Crown Castle, GSA and T-Mobile gained a benefit as a result of the agreement. Urban Sites makes this argument even though it never reduced the amount of rent charged to Sprint when the reduced site plan had purportedly reduced the leased area from 25 by 50 feet in the

original site plan to 25 by 34 feet. As such, Sprint and its assignees have always paid the same amount of money of rent to Urban Site as if the original site plan had always been in place. Therefore, Urban Sites has not presented any evidence that it suffered a detriment.

¶ 46     Further, the cases relied upon by Urban Sites to support its argument that the 2005 agreement was not a valid modification of the Sprint lease are distinguishable from this case. In *Ross*, a former employee filed a breach of contract claim against his former employer under the terms of a 1968 employee handbook to which the parties had agreed. *Ross v. May Co.*, 377 Ill. App. 3d 387, 388 (2007). The employer claimed that the 1968 handbook had been modified by the disclaimers inserted into later revised handbooks. *Id.* at 389. The court reviewed the alleged modification of the employment contract based upon provisions in the revised handbooks. *Id.* at 388. The court held that the disclaimers in the revised handbooks did not modify the former employee's employment contract because he did not receive any consideration. *Id.* at 389. Although the employer had offered the former employee additional benefits such as paid personal days, disability insurance and a retirement savings plan, these additional benefits were offered to all employees and were not part of a bargained-for exchange with the former employee. *Id.* at 392.

¶ 47     Similarly, in *Doyle*, the court also dealt with a situation where an employer unilaterally changed certain policies for existing employees by way of an employee handbook. *Doyle*, 186 Ill. 2d at 106. The plaintiffs were nurses formerly employed by the employer and had worked for the employer continuously until they were discharged. *Id.* The employer had issued to both its existing employees and new hires an employee handbook which contained a number of policies and provisions regarding employment. *Id.* One of the policies at issue set forth factors used in determining how employees would be discharged. *Id.* at 106-07. The plaintiffs, as former employees, sued the employer under theories of breach of contract and promissory estoppel, claiming that they were terminated in violation of the employee handbook. *Id.* at 107. The court held that such unilateral changes did not modify the former employees' employment contracts. *Id.* at 112-13.

¶ 48     Unlike the situations in both *Ross* and *Doyle*, this case presents a scenario where there was a reciprocal agreement that was knowingly entered into by the parties involved. The present case does not involve the unilateral actions of one party. The 2005 agreement was fully executed by representatives of both Urban Sites and Sprint. Urban Sites had an opportunity to read the agreement prior to signing it and represented that it was bound by the agreement. Urban Sites cannot now say that it was deceived by its own negligence in not reading the attached documents.

¶ 49     Similarly, *Chisolm* is also distinguishable from the instant case, which involved a residential landlord-tenant dispute. The tenant alleged that the landlords breached their continuing legal duty to clear ice and snow from the walkway, and sought to recover for injuries sustained as a result of the landlords' negligence and willful and wanton conduct. *Chisolm v. Stephens*, 47 Ill. App. 3d 999, 1002 (1977). The lease in *Chisolm* did not contain an express covenant dealing with the landlords' duty to remove natural accumulations of ice and snow. *Id.* Unlike *Chisolm*, this case is based in contract law, and the express and unambiguous language of the 2005 agreement–rather than any implied duties or promises–governed the outcome of the case.

¶ 50 Urban Sites also raises the argument that there was never a meeting of the minds or mutual assent between the parties to modify the dimensions of the leased area. However, Urban Sites has not raised a genuine issue of material fact that the parties had no meeting of the minds with respect to the agreement.

¶ 51 As a general rule, an enforceable contract must include a meeting of the minds or mutual assent as to the terms of the contract. *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 30 (1991). In order for a contract to come into being there must be mutual assent between all of the parties. *Calo, Inc. v. AMF Pinspotters, Inc.*, 31 Ill. App. 2d 2, 8 (1961). Generally, it is the objective manifestation of intent that controls whether a contract has been formed. *Caporale v. Mar Les, Inc.*, 656 F.2d 242, 244 (7th Cir. 1981). The subjective understanding of the parties is not required in order for there to be a meeting of the minds. *Steinberg*, 69 Ill. 2d at 331.

¶ 52 For the same reasons expressed previously regarding Urban Sites' modification argument, its argument about whether there was a meeting of the minds is undercut by the circuit court's ruling that Urban Sites was estopped based on its clear representations in the 2005 agreement. Moreover, Urban Sites' assertion that there was no meeting of the minds between the parties is based on speculation and is not supported by any evidence in the record. Similarly, Much, as the manager of Urban Sites, provided no evidentiary support for this claim at the summary judgment stage. In support of its argument that there was no meeting of the minds, Urban Sites only refers to Much's affidavit, which was only submitted in support of its motion to reconsider. As discussed, Much's affidavit must be disregarded as it was not properly before the circuit court at the time of its ruling on the motions for summary judgment.

¶ 53 Contrary to Urban Sites' unsupported claims, the language from the 2005 agreement shows there was a meeting of the minds to increase the leased area to 25 by 50 feet. The express language of the estoppel certificate in the 2005 agreement demonstrated that the parties intended to change the leased area to 25 by 50 feet, as acknowledged by Much's initials on the attached copies of the original site plan. By executing the 2005 agreement, Urban Sites had represented that the attached Sprint lease contained the entire agreement between landlord and tenant with respect to the leased property. Thus, uncontroverted evidence establishes that Urban Sites and Sprint had a meeting of the minds that the original site plan of 25 by 50 feet would be Sprint's leased area of the property. Urban Sites' attempt to suggest otherwise is not supported by evidence, and thus, Urban Sites has not raised a genuine issue of material fact to survive summary judgment. Therefore, we hold that the circuit court properly entered summary judgment in favor of Crown Castle, GSA and T-Mobile, and against Urban Sites.

¶ 54 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 55 Affirmed.