# Illinois Official Reports

## Appellate Court

---

### *F.R.S. Development Co. v. American Community Bank & Trust*, 2016 IL App (2d) 150157

---

| | |
|---|---|
| Appellate Court Caption | F.R.S. DEVELOPMENT COMPANY, INC., Plaintiff and Counterdefendant-Appellee, v. AMERICAN COMMUNITY BANK AND TRUST, Defendant and Counterplaintiff-Appellant (M and I Regional Properties, LLC, Counterplaintiff-Appellant; The Village of Huntley, Defendant). |
| District & No. | Second District<br>Docket Nos. 2-15-0157, 2-15-0457 cons. |
| Filed | February 23, 2016 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 12-LA-414; the Hon. Thomas A. Meyer, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James L. Wright, of Zanck, Coen, Wright & Saladin, P.C., of Crystal Lake, for appellants.<br><br>Jennifer J. Gibson and David W. McArdle, both of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellee. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion.<br>Presiding Justice Schostok and Justice Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant and counterplaintiff, American Community Bank & Trust, and counterplaintiff, M&I Regional Properties, LLC (collectively, the bank), appeal from an order of the circuit court of McHenry County granting summary judgment in favor of plaintiff and counterdefendant, F.R.S. Development Co., Inc. (FRS), on the bank's amended counterclaim for declaratory judgment. The bank sought a declaration that it foreclosed certain "recapture rights" when it foreclosed on two parcels of real estate that were collateral for a defaulted loan. The trial court found that the recapture rights were personal property not subject to foreclosure. The bank appeals in case No. 2-15-0157. Following the court's grant of summary judgment in FRS's favor, FRS sought attorney fees from the bank, pursuant to a fee-shifting provision in the parties' settlement agreement and mutual release that resulted in a consent foreclosure. The court awarded FRS $179,000, and the bank appeals in case No. 2-15-0457. This court consolidated the appeals. We affirm.

¶ 2                             I. BACKGROUND

¶ 3                        A. Recapture Rights Explained

¶ 4      Section 9-5-1 of the Illinois Municipal Code (Code) (65 ILCS 5/9-5-1 (West 2010)) provides that whenever a municipality requires a developer to install certain public improvements within the subdivision, and where, in the opinion of the corporate authorities of the municipality, the required improvements may be used for the benefit of property outside the subdivision, the municipality may contract with the developer to reimburse the developer for a portion of the cost of the improvements. The reimbursement is to be made from fees charged by the municipality to the owners of the outside property, "when and as collected from the owners." 65 ILCS 5/9-5-1 (West 2010).

¶ 5      Section 9-5-2 of the Code requires that "[a]ny contract" entered into between the corporate authorities of a municipality and a developer pursuant to section 9-5-1 shall be recorded in order to "notify persons interested in such property of the fact that there will be a charge in relation to such property for the connection to and use of the facilities constructed under the contract." 65 ILCS 5/9-5-2 (West 2010).

¶ 6      Although section 9-5-1 literally provides for a "reimbursement," in common parlance a reimbursement is known as a "recapture." *Hartz Construction Co. v. Village of Western Springs*, 391 Ill. App. 3d 75, 80 (2009) (section 9-5-1 provides the statutory requirements for "recapture" in nonhome-rule municipalities). Hence, the parties in the present case use the term "recapture rights" when referring to the statutory and contractual reimbursement obligation of defendant, the Village of Huntley (Village).

¶ 7      Two types of recapture rights are implicated in the present litigation. FRS and the Village entered into a contract that required FRS to construct certain roadway and intersection improvements, as well as sewer improvements, in a proposed subdivision. The contract further provided that FRS would recapture a portion of the costs it expended in constructing those improvements, from fees that the Village would collect from the owners of certain benefited properties. Only the roadway and intersection recapture rights are at issue in this appeal. The parties agree that the value of those recapture rights is approximately $1.3

million. Although the sewer recapture rights are not at issue, they played a role in the complex transaction that resulted in the settlement agreement and mutual release. The settlement agreement and mutual release led to the entry of a consent foreclosure, by reason of which the bank now claims that FRS no longer owns the roadway and intersection recapture rights.

¶ 8    Throughout this opinion, we use the term "recapture rights" when referring to the reimbursement for the roadway and intersection improvements. Although this is consistent with the parties' nomenclature, our understanding and usage of the term differ from those espoused by the bank. The bank states that "recapture rights" refers to the *developer's* right to recapture from the owners of the benefited property a portion of the cost of the improvements. More accurately, section 9-5-1 grants the *municipality* the power to reimburse the developer, from fees the *municipality* collects pursuant to its contract with the developer. 65 ILCS 5/9-5-1 (West 2010). "[T]he legislature intended to make a broad grant of authority to *municipalities* in order to recapture a portion of the costs a developer expends on improvements ***." (Emphasis added.) *Hartz*, 391 Ill. App. 3d at 80. We keep this distinction in mind as we proceed through the facts and our analysis.

¶ 9                        B. Transactions Occurring Before the Bank Loan
¶ 10    Frank Sajtar controlled FRS and F.G.M. of Huntley, LLC (FGM). In 2003, FRS was under contract to purchase a parcel of real estate known as Talamore, located northwest of state Route 47 and Reed Road in the Village. FRS owned a parcel that was adjacent to Talamore, known as the Garlieb-Hardy parcel.[1] FGM owned a 40-acre parcel (the 40-acre parcel) that was also adjacent to Talamore.

¶ 11    On September 12, 2003, FRS and the Village entered into a Facilities Expansion Agreement (FEA) relating to the development of Talamore. Pertinent to this appeal, the FEA required FRS to construct certain roadway and intersection improvements at FRS's own expense.[2] The FEA also provided that FRS would recapture a portion of its costs pursuant to the terms of a "Road Improvement Recapture Agreement." The Road Improvement Recapture Agreement designated the 40-acre parcel and the Garlieb-Hardy parcel as benefited properties whose owners would be charged fees for the use of the improvements. Under the terms of the Road Improvement Recapture Agreement, the Village would collect and remit those fees to FRS.

¶ 12    In February 2004, FRS obtained title to Talamore and simultaneously conveyed it to Huntley Venture, LLC (Huntley Venture). As part of that transaction, FRS assigned the recapture rights to Huntley Venture. Ultimately, Huntley Venture constructed the public improvements.

¶ 13    Needing more land for the improvements, Huntley Venture acquired a strip of the 40-acre parcel from FGM and a strip of the Garlieb-Hardy parcel from FRS. Those acquisitions were embodied in a "Right-of-Way Purchase and Sale Agreement," dated January 27, 2005. As

---

[1]This parcel is sometimes referred to in the record as the "Hardy-Garlieb" parcel.

[2]The FEA also required FRS to construct sewer improvements, as noted above. Because the sewer recapture rights are not at issue in this appeal, we do not discuss them here. Unless we designate otherwise, "recapture rights" refers to the roadway and intersection recapture rights. However, we will spell out "roadway and intersection recapture rights" where necessary for clarity.

part of the consideration for the purchase, Huntley Venture permanently waived the recapture rights against the 40-acre parcel and limited the recapture rights against the Garlieb-Hardy parcel to $358,220. A memorandum of that agreement was recorded.

¶ 14    A dispute over development issues arose among Huntley Venture, FRS, and FGM. On February 9, 2006, they entered into a written settlement agreement.[3] Pertinent here, Huntley Venture purported to rescind its waiver of the recapture rights as to the 40-acre parcel and its limitation as to the Garlieb-Hardy parcel and to assign them back to FRS and FGM. The assignment was recorded.

¶ 15                                   C. The Bank Loan

¶ 16    On May 17, 2006, the bank loaned FGM $12,500,000. FGM mortgaged the 40-acre parcel as collateral for the loan. As additional collateral, FRS mortgaged the Garlieb-Hardy parcel. As further security, FGM and FRS executed a "Commercial Security Agreement," which included a Uniform Commercial Code-1 (UCC-1) financing statement. The UCC-1 covered "all proceeds relating to" the February 9, 2006, settlement agreement among Huntley Venture, FRS, and FGM.

¶ 17    FGM defaulted on the loan, and on January 30, 2009, the bank filed a foreclosure action.

¶ 18                                 D. The Foreclosure Suit

¶ 19    The bank sought to foreclose on the 40-acre parcel and the Garlieb-Hardy parcel. Additionally, in count XIII of the amended foreclosure complaint, the bank sought to foreclose on its security interest as evidenced by the UCC-1 statement.

¶ 20    The parties negotiated a settlement that culminated in a consent foreclosure. Pertinent here, in a July 14, 2009, draft of that agreement, FRS agreed to assign the bank 80% of its sewer recapture rights, and the bank agreed to release its security interests in "all other chattel paper, accounts, and general intangibles of FRS (including but not limited to all rights under the Settlement Agreement by and between FRS, FGM, and Huntley Venture dated February 9, 2006)." On August 21, 2009, counsel for FRS and FGM formally requested that the bank release its security interests in the roadway and intersection recapture rights. Counsel for FRS and FGM also indicated his clients' intention to assign those rights to Nelson's-Florida, LLC (Nelson's-Florida),[4] before title to the 40-acre parcel and the Garlieb-Hardy parcel was conveyed to the bank in the foreclosure process.

¶ 21    In the final settlement agreement and mutual release, executed by the parties on August 25, 2009, FRS and FGM consented to the entry of a judgment of foreclosure, except as to "intangible collateral." In paragraph 8, FRS agreed to assign to the bank FRS's rights to receive 80% of the sewer recapture amount. In subparagraph (c) of paragraph 8, the bank agreed to release its security interests in "all other chattel paper, accounts, and general intangibles of FRS and FGM (including, but not limited to, all rights under the Settlement

---

[3]In various other documents, including the bank's "Release of Security Interest," the date of the February 9, 2006, settlement agreement is erroneously noted as January 30, 2005. The parties agree that this is a scrivener's error.

[4]The reason for the assignment to Nelson's-Florida is not apparent from the record.

- 4 -

Agreement by and between FRS, FGM, and Huntley Venture, LLC, dated February 9, 2006)."

¶ 22 FRS assigned the roadway and intersection recapture rights to Nelson's-Florida two days before the execution of the settlement agreement and mutual release. On August 25, 2009, the bank signed a "Release of Security Interest," specifically releasing its interests in the roadway and intersection recapture rights. That release was accompanied by the filing of a UCC-3 statement terminating the bank's security interests. Then, on October 23, 2009, FRS and FGM transmitted to the bank quitclaim deeds for the 40-acre parcel and the Garlieb-Hardy parcel. Both deeds were subject to the roadway and intersection recapture rights. The bank recorded the deed to the 40-acre parcel, but it did not record the deed to the Garlieb-Hardy parcel. No reason for the omission appears in the record.

¶ 23 On August 28, 2009, a consent judgment of foreclosure was entered in accordance with the settlement agreement and mutual release. The bank dismissed with prejudice count XIII of the amended foreclosure complaint.

¶ 24 On January 6, 2011, Nelson's-Florida assigned the roadway and intersection recapture rights back to FRS.

¶ 25                               E. The Recapture Ordinance

¶ 26 Following Nelson's-Florida's assignment of the recapture rights back to FRS, FRS requested that the Village fulfill the terms of the FEA and pass a recapture ordinance.[5] The bank informed the Village that FRS did not own the recapture rights, as they had been foreclosed. The Village tabled FRS's request but briefly revived the matter at FRS's insistence. Finally, the Village indefinitely tabled the matter.

¶ 27 FRS sued the Village for breach of the FEA and sued the bank for tortious interference with contract. The bank counterclaimed, seeking a declaration that the recapture rights had been foreclosed. During the litigation, the Village passed a recapture ordinance, and FRS voluntarily dismissed its suit. The bank's counterclaim remained pending, and the parties submitted cross-motions for summary judgment on the bank's amended counterclaim. The trial court granted FRS's motion and denied the bank's motion. Then the court awarded $179,000 in attorney fees to FRS as the prevailing party, under the settlement agreement and mutual release. The bank filed its timely appeals.

¶ 28                                  II. ANALYSIS

¶ 29 The bank raises three issues in this appeal: (1) whether Huntley Venture's permanent waiver of the recapture rights prevented it from assigning those rights back to FRS; (2) if Huntley Venture's assignment of the recapture rights back to FRS was effective, whether FRS's recapture rights were foreclosed; and (3) whether the award of attorney fees to FRS must be reversed.

¶ 30                A. Huntley Venture's Waiver of the Recapture Rights

¶ 31 We first address the bank's contention that Huntley Venture's "permanent waiver" of the recapture rights as to the 40-acre parcel and its limitation of the recapture rights as to the

_____

[5]The record indicates that the recapture rights granted in the FEA were "anticipatory."

Garlieb-Hardy parcel prevented it from assigning the recapture rights back to FRS in the February 9, 2006, agreement, which settled the dispute among Huntley Venture, FRS, and FGM. If FRS never reacquired the recapture rights, the Village ordinance would be nugatory.

¶ 32 The issue is whether the February 9, 2006, settlement agreement modified the right-of-way purchase and sale agreement, in which Huntley Venture waived and limited the recapture rights. The bank contends that it did not and that Huntley Venture's waiver was a relinquishment of the recapture rights. The construction of a contract presents a question of law, which we review *de novo. Gallagher v. Lenart*, 226 Ill. 2d 208, 219 (2007).

¶ 33 A modification of a contract is a change in one or more aspects of it that introduces new elements into the details or cancels some of them but leaves the general purpose and effect of the contract intact. *Richard W. McCarthy Trust v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 533-34 (2011). Parties to a contract are generally free to modify the contract as long as the modification does not violate the law or public policy. *Richard W. McCarthy Trust*, 408 Ill. App. 3d at 534. A modification of a contract must satisfy the criteria for a valid original contract, including offer, acceptance, and consideration. *Richard W. McCarthy Trust*, 408 Ill. App. 3d at 534. When a modification is inconsistent with a term of the original contract, the modification is interpreted as including an agreement to rescind the inconsistent term. *Richard W. McCarthy Trust*, 408 Ill. App. 3d at 534. Parties may modify or waive their rights under a contract and embed new terms. *Urban Sites of Chicago, LLC v. Crown Castle USA*, 2012 IL App (1st) 111880, ¶ 36. Ordinarily, parties are as free to change a contract after making it as they were to make it in the first place. *Urban Sites*, 2012 IL App (1st) 111880, ¶ 37.

¶ 34 In the present case, when they executed the February 9, 2006, settlement agreement, FRS, FGM, and Huntley Venture rescinded the waiver of and the limitation on the recapture rights embodied in the right-of-way purchase and sale agreement. The rest of the right-of-way purchase and sale agreement was left intact. "Modification of a contract normally occurs when the parties agree to alter a contractual provision or to include additional obligations, while leaving intact the overall nature and obligations of the original agreement." *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 468 (2004).

¶ 35 The bank maintains that, once Huntley Venture "permanently" waived the recapture rights and recorded a document memorializing that waiver, the parties could not modify that term of the right-of-way purchase and sale agreement. The bank cites no authority for that proposition. Instead, the bank relies on the general, but irrelevant, rule that "waiver is the voluntary and intentional relinquishment of a known right," citing *Ryder v. Bank of Hickory Hills*, 146 Ill. 2d 98, 104-05 (1991), and *In re Application of the County Treasurer & ex officio County Collector*, 373 Ill. App. 3d 679, 696 (2007). However, neither of those cases involved the modification of a contract. Were we to apply the general waiver rule instead of principles of contract interpretation, we would violate the proposition that "[p]arties to a contract are not locked into its terms forever." *Schwinder*, 348 Ill. App. 3d at 468. Accordingly, we hold that the February 9, 2006, settlement agreement modified the right-of-way purchase and sale agreement and was effective to assign the recapture rights back to FRS.

## B. Alleged Foreclosure of the Recapture Rights

¶ 37     Whether the bank foreclosed the recapture rights depends on whether those rights were real property subject to foreclosure.[6] This is an issue of first impression. At oral argument, FRS contended that we need not reach the issue, because the bank released the recapture rights as part of the negotiated settlement that resulted in the consent foreclosure. According to FRS, that settlement represents a "meeting of the minds" that FRS would "walk away" from the foreclosure with the recapture rights in hand. FRS maintains that the bank is in breach of contract for asserting that it foreclosed the recapture rights.

¶ 38     The bank does not dispute that it released certain recapture rights, but it disputes that it released the recapture rights pertaining to the Garlieb-Hardy parcel and the 40-acre parcel, on which it foreclosed. The bank maintains that where the owner of real property also owns the recapture rights it can mortgage them and that, upon foreclosure, the recapture rights are also foreclosed. On the other hand, according to the bank, where the owner of the recapture rights does not also own the real estate, it receives only a stream of income from those rights, which is treated as personal property. Thus, according to the bank, it can have it both ways, and did. The bank asserts that its release of security interest released those personal-property income-stream rights on property other than the mortgaged Garlieb-Hardy parcel and 40-acre parcel and also released the rights to "general intangibles" with regard to the Garlieb-Hardy parcel and the 40-acre parcel.

¶ 39     It seems indisputable that the release of security interest included the recapture rights in relation to the Garlieb-Hardy parcel and the 40-acre parcel. The release recited that it included "all rights of F.R.S. Development Co., Inc. to recover roadway and intersection recapture payments and all other rights under" the settlement agreement of February 9, 2006, "by and between F.R.S. Development Co., Inc., F.G.M. of Huntley, LLC and Huntley Venture, LLC." Paragraph 3 of the February 9, 2006, settlement agreement specifically named the Garlieb-Hardy parcel and the 40-acre parcel. Nowhere did the bank and FRS make the distinction between "general intangibles" and recapture rights in relation to the Garlieb-Hardy parcel and the 40-acre parcel that the bank now urges. Indeed, the distinction seems to be an afterthought, because the bank accepted quitclaim deeds to those parcels specifically reserving the recapture rights to FRS.[7] Thus, we are not persuaded by the bank's logic or argument.

¶ 40     However, neither are we persuaded that the February 9, 2006, agreement ends the matter. Essentially, the parties agreed to treat the recapture rights as personal property. The bank now maintains that they could not effectively do so, because the legislature intended that

---

[6]Each step in a foreclosure action seeks to terminate the borrower's legal and equitable interests in the real estate. 735 ILCS 5/15-1203 (West 2010); *Wells Fargo Bank, N.A. v. McCluskey*, 2013 IL 115469, ¶ 24. The borrower's interests are terminated by the judicial sale, and it is the confirmation of the sale that ultimately divests the borrower of his or her property rights. *McCluskey*, 2013 IL 115469, ¶ 30.

[7]The bank refers to the quitclaim deeds as "wild deeds," meaning that they are outside the official chain of title (see *Village of Lombard v. Department of Transportation*, 2013 IL App (2d) 121042, ¶ 32 n.2) because the foreclosure decree vested title in the bank. However, the deeds indicate the parties' apparent intent for the bank to release the recapture rights in exchange for the consent foreclosure.

recapture rights be an interest in real property.[8] Put simply, the bank argues that, if the recapture rights are real property, the release of security interest did not cover them.

¶ 41    In our view, the resolution of this appeal is governed by well-established rules of statutory construction. We are mindful that we are not free to rewrite legislation. *Westinghouse Airbrake Co. v. Industrial Comm'n*, 306 Ill. App. 3d 853, 856 (1999). Nor are the parties free to usurp the legislature's authority to enact laws. *Westinghouse*, 306 Ill. App. 3d at 856. "[A] statute must be enforced as enacted by the legislature." *Westinghouse*, 306 Ill. App. 3d at 856.

¶ 42    In determining the legislative intent, the court first considers the statutory language. *Balmoral Racing Club, Inc. v. Topinka*, 334 Ill. App. 3d 454, 458 (2002). If the legislative intent can be ascertained from the statute's plain language, that intent prevails without resort to other interpretive aids. *Balmoral*, 334 Ill. App. 3d at 459. The court must consider the entire statute and interpret each of its parts together. *Balmoral*, 334 Ill. App. 3d at 458-59.

¶ 43    Here, the parties submitted the issues to the trial court on cross-motions for summary judgment. When parties file cross-motions for summary judgment, they agree that only questions of law are involved, and they invite the court to decide the issues based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. Summary judgment is appropriate only where the pleadings, depositions, admissions and affidavits on file, when viewed in the light most favorable to the nonmovant, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Pielet*, 2012 IL 112064, ¶ 29.

¶ 44    We review *de novo* a case decided on summary judgment. *Pielet*, 2012 IL 112064, ¶ 30. *De novo* review is appropriate also because the construction of a statute presents a question of law. *Pielet*, 2012 IL 112064, ¶ 30.

¶ 45    The bank's argument that recapture rights are real property is based upon its interpretation of other statutes, such as the Code of Civil Procedure (see 735 ILCS 5/12-105 (West 2010) (defining "real estate")) and the Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1101 *et seq.* (West 2010)). However, resort to extraneous sources is unnecessary, because the language of section 9-5-1 is clear and unambiguous. See *Calamari v. Drammis*, 286 Ill. App. 3d 420, 425 (1997) (courts look to other statutes as a construction aid only when the statute at issue is ambiguous).

¶ 46    Section 9-5-1 is titled "Reimbursement of subdivider for facilities, roadways or improvements beneficial to public." 65 ILCS 5/9-5-1 (West 2010). As we explained above, this section provides that whenever a municipality requires a developer to install certain municipal improvements, and when the corporate authorities determine that those improvements may be used for the benefit of outside property, the municipality can contract with the developer to reimburse it for a portion of the cost of the improvements. 65 ILCS 5/9-5-1 (West 2010). The contract between the municipality and the developer "shall" provide that the municipality will collect fees from the owners of the benefited property, before those owners connect to or use the facilities. 65 ILCS 5/9-5-1 (West 2010).

¶ 47    Thus, we conclude that the legislature intended to provide that the developer be reimbursed for the cost of installing public improvements. To accomplish that purpose, the legislature authorized municipalities to contract with the developer for such reimbursement.

[8]For this reason, we reject FRS's contentions that promissory estoppel and *res judicata* bar the bank's argument that it did not release the recapture rights.

The reimbursement is to be funded from fees the municipality charges the owners of benefited real properties who use the public improvements. Consequently, the developer obtains no legal or equitable interest in the benefited real properties. The developer's only right is to have the municipality collect fees from the owners of the benefited real properties. The owners of the benefited real properties are bound as third parties to the contract between the municipality and the developer. *Beneficial Development Corp. v. City of Highland Park*, 161 Ill. 2d 321, 331 (1994).

¶ 48  It is the use of the improvements, not the land itself, that generates the so-called "recapture fees." "Through imposition of a recapture fee, a municipality is apportioning the cost of local improvements *among those of its constituents who will use the improvements*." (Emphasis added.) *Beneficial*, 161 Ill. 2d at 328-29. Indeed, when improvements will not be used by owners of the benefited properties, no recapture fees can legally be collected. *Beneficial*, 161 Ill. 2d at 331-32. Consequently, because the legislature intended the owners of the benefited properties to pay fees for the use of the improvements, the developer's right to those fees cannot be an interest in the properties themselves.

¶ 49  The bank ignores the plain language of section 9-5-1, which it admits is not ambiguous, and focuses instead on the recording requirement of section 9-5-2. Section 9-5-2 provides that a contract such as the FEA shall be recorded. 65 ILCS 5/9-5-2 (West 2010). "The recording of the contract *** shall serve to notify persons interested in such property of the fact that there will be a charge in relation to such property for the connection to and use of the facilities constructed under the contract." 65 ILCS 5/9-5-2 (West 2010). The bank interprets the recording requirement as evidencing an interest in the real properties against which the notice is recorded. However, the plain language of section 9-5-2 states that the purpose of recording the contract is only to give the owners of the benefited properties notice of charges for connecting to and using public facilities. Moreover, the "charge" is not against the benefited properties but is "in relation to such property" for the use of the improvements constructed under the contract between the developer and the municipality. 65 ILCS 5/9-5-2 (West 2010). The "charge" is like a toll for the use of a highway or a user fee.

¶ 50  Nevertheless, the bank contends that FRS recognized that the recapture rights were an interest in real property when it recorded memoranda of transactions affecting the recapture rights. Those transactions were Huntley Venture's waiver and limitation of the recapture rights in connection with the purchase of slivers of the 40-acre parcel and the Garlieb-Hardy parcel and Huntley Venture's subsequent assignment of the recapture rights back to FRS. Both of the recorded memoranda recited that "the obligations described herein are obligations which are appurtenant to and which runs [*sic*] with the land." However, both memoranda also recited that they were recorded for the purpose of giving notice of the matters described. Moreover, whether recapture rights under section 9-5-1 are an interest in real property is a matter for legislative determination, and the recording of the memoranda has no bearing on that issue.

¶ 51  Further, the purpose of section 9-5-1 is not to protect mortgagees of the benefited properties but to reimburse the developer for its costs in constructing public improvements that the owners of the benefited properties use. "The plain language of section 9-5-1 tells us the legislature intended to make a broad grant of authority to municipalities in order to recapture a portion of the costs a developer expends on improvements ***." *Hartz*, 391 Ill. App. 3d at 80. The court in *Hartz* declared that the "legislature intended to place very few

restrictions on *** municipalities' power to recapture costs" under section 9-5-1. *Hartz*, 391 Ill. App. 3d at 81. That is so because recapture facilitates development, which serves a public purpose. *Beneficial*, 161 Ill. 2d at 331.

¶ 52 The public purpose of section 9-5-1 would be frustrated if we interpreted the statute as conferring an interest in the benefited properties. If mortgagees could extinguish a developer's right to reimbursement by foreclosing on the benefited properties, growth would be discouraged. In interpreting a statute, courts cannot read into it words that are not within the intent of the legislature as determined from the statute. *County of Kankakee v. Anthony*, 304 Ill. App. 3d 1040, 1047 (1999). Nor can courts restrict or enlarge the meaning of a statute. *Kankakee*, 304 Ill. App. 3d at 1047.

¶ 53 Had it so intended, the legislature could have provided that recapture rights pursuant to section 9-5-1 are a lien on benefited real properties. For example, the legislature provided that when a municipality charges a contiguous unincorporated property for the benefits conferred by local improvements (65 ILCS 5/9-4-1 (West 2010)), the amount of the charge is a lien against the benefited property. 65 ILCS 5/9-4-3 (West 2010). When the legislature uses certain language in one part of a statute but uses different language in another part, we assume that different meanings were intended. *Gutraj v. Board of Trustees of the Police Pension Fund*, 2013 IL App (2d) 121163, ¶ 8. Because section 9-4-3 demonstrates that the legislature knew exactly how to impose a lien on a benefited property, the fact that it declined to do so in section 9-5-1 means that no such lien was authorized. See *Gutraj*, 2013 IL App (2d) 121163, ¶ 10 (concluding that, because the legislature knew how to draft language making certain pension benefits mutually exclusive in one part of the statute, failing to do so in the part of the statute under consideration meant that the legislature did not intend mutual exclusivity).

¶ 54 At oral argument, the bank denied that it was claiming that recapture rights are a lien, or even akin to a lien. What other type of interest in real property they could be has not been answered. Indeed, the bank conceded that recapture rights are contractual between the developer and the municipality and that the fruits of recapture are monetary payments. Consequently, we reject the bank's argument that the mortgages encompassed the recapture rights. A mortgage is an interest in land, created by a written instrument providing security in real estate to secure payment of a debt. *Schilling v. Stahl*, 395 Ill. App. 3d 882, 888 (2009). A mortgagor can grant a lien only on the interest he holds in the property. *In re Wirth*, 355 B.R. 60, 62 (Bankr. N.D. Ill. 2005). In other words, a mortgagee has no greater rights than its mortgagor. *Wirth*, 355 B.R. at 63.

¶ 55 Based upon the foregoing, we hold that recapture fees due to a developer pursuant to section 9-5-1 of the Code are not an interest in the benefited property and are not subject to foreclosure. Accordingly, the trial court properly denied the bank's motion for summary judgment and granted FRS's motion for summary judgment.

¶ 56                              C. The Award of Attorney Fees

¶ 57 The trial court awarded FRS $179,000 in attorney fees, as authorized by paragraph 17 of the settlement agreement and mutual release. If a contract authorizes an award of attorney fees, the court may award fees that are reasonable. *McNiff v. Mazda Motor of America, Inc.*, 384 Ill. App. 3d 401, 404 (2008). A trial court's decision whether to award attorney fees is within its discretion and will not be reversed absent an abuse of discretion. *McNiff*, 384 Ill.

App. 3d at 404. The bank does not contest the amount or the reasonableness of the fees. Instead, the bank's sole argument is that FRS was not properly the prevailing party. Because we have determined that the trial court properly granted FRS's motion for summary judgment, we hold that FRS was the prevailing party. Accordingly, we cannot say that the trial court abused its discretion in awarding fees.

¶ 58                                                III. CONCLUSION

¶ 59        For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

¶ 60        Affirmed.